WOODRUFF ELECTRIC COOP. CORP. *v.* ARK. PUBLIC SERVICE COMM.

5-2388                                                                 351 S. W. 2d 136

Opinion delivered November 6, 1961.

[Rehearing denied December 11, 1961.]

*Eldridge & Eldridge,* for Woodruff Electric Cooperative Corp.; *Leland F. Leatherman,* for Ark. State Electric Cooperative, Inc., appellant.

*Jack P. West,* for City of Forrest City; *House, Holmes, Butler & Jewell* and *Mann & McCulloch,* for Ark. Power & Light Co., appellee.

PAUL WARD, Associate Justice. The problems involved in this litigation were germinated in 1957 when the Arkansas Power and Light Company took over territory previously assigned to the Woodruff Electric Corporation. Several parties are involved, so, before summarizing the factual background it will be helpful to identify them at this point. Appellant, Woodruff Electric Co-operative Corporation, will be referred to as Woodruff; Arkansas Power and Light Company as Power Company; the city of Forrest City as City; the Arkansas State Electric Cooperative as State Electric; and the Arkansas Public Service Commission as Commission.

Woodruff was organized in 1937 pursuant to Act 342 of that year. It is here noted that said act gave such organizations authority to operate in rural areas, and Sec. 2 (8) of the Act defines ''Rural Area'' as all area except that area in cities and towns having a population in excess of twenty five hundred. In 1948 the City leased to the Power Company (by a 31 page document signed

by both parties) its power plant and auxiliary equipment with the right to serve the City. (This lease was not to be effective until the Power Company had completed a large power unit some miles outside the City limits). In 1950 Woodruff erected a large warehouse and office building on land adjacent to the north side of the City limits at a cost of approximately $150,000. In 1951 the Power Company's lease became effective when it took over the operation of the City's plant and distribution system. Following this, in 1953, the Commission allocated to Woodruff 120 acres of land north of the City limits which we will hereafter call "area". This area was near Woodruff's warehouse and office building. Also it was bisected by a through highway and was near the railroad.

Two or three years after the Commission made the allocation to Woodruff the citizens of the City became interested in a project to secure an out-of-state industry. This resulted in a firm named Yale & Towne agreeing to locate on the "area" provided the City would extend its boundaries to include that location and also, it seems, provided it would be furnished electricity by the Power Company. Pursuant to the above, the City, on December 10, 1956, annexed a portion of the "area" and on January 25, 1957 the Power Company contracted to furnish power to Yale & Towne. This resulted, of course, in Woodruff being deprived of a portion of its allocated territory including nine members therein which it had formerly been serving. So, on March 21, 1957 Woodruff filed a complaint before the Commission against the Power Company for relief under Act 85 of 1955. The City and the State Electric intervened, and after a full hearing the Commission ruled against Woodruff on the sole ground that Sec. 3 of said Act 85 precluded Woodruff from receiving any relief. On appeal by Woodruff and the State Electric to the Circuit Court of Pulaski County the Commission was affirmed, and they now prosecute an appeal to this Court for relief.

On appeal Woodruff insists that the only question for decision is the construction of Sec. 3 of Act 85 of 1955, but the Power Company and the City also challenge the constitutionality of the act.

*Construction of Section 3.* First we examine the history of Act 85 and our former interpretation of the prior Act No. 342 of 1937. The only decision of this Court which bears materially on the issue here is the case of *Farmers Electric Cooperative Corporation* v. *Arkansas Power & Light Company,* 220 Ark. 652, 249 S. W. 2d 837. In the cited case appellant served territory adjacent to the City of Newport which was later taken over by appellee. When the City annexed a portion of appellant's territory and appellee's service followed, appellant sought relief (as here) against appellee. On appeal we in effect held, that when the City extended its boundaries to take in new area appellee was obligated to serve such area and that there was no provision in the law whereby the cooperatives could be compensated for loss of territory. In speaking of the latter situation we said:

"No doubt the General Assembly failed to foresee the conflict here presented when Act 342 was being considered, else some provision would have been made for the awkward situation."

There can be little doubt that the legislature had this "awkward situation" in mind when it passed Act 85 of 1955. At any rate this act does provide a method of relief to a cooperative which has been deprived of a portion of its alloted territory. It is crystal clear that a situation could arise where it would be unjust to deprive a cooperative of a lucrative territory which it alone had developed over a long period of time. Whether or not that situation obtains to a small or large degree in the case before us now is immaterial because, in either event, the same principle is involved, and the interpretation of Act 85 would be the same. With this in mind we proceed to an analysis of said act.

Sec. 1 of Act 85 amends Sec. 2 (8) of Act 342 of 1937 which, as before mentioned, merely defines the area in which cooperatives may operate. The amendment contains all the language in said Sec. 2 (8) and also additional language relating thereto, but it is not material here. Then the section further provides as follows:

". . . and said Corporation shall not be ousted from service in said rural area or deprived of the right to continue to provide electric service in said rural area subsequent to the granting of a Certificate of Convenience and Necessity by the Arkansas Public Service Commission, except as provided in this Act, as amended."

It is conceded that Woodruff has been assigned the territory here involved by the Commission when the Power Company took it over. It is obvious therefore from the above quoted portion of Sec. 1 that Woodruff can be "ousted", but it remains to be seen *how* and on *what conditions.*

The answers to the above questions are to be found in Sec. 2 of Act 85. One portion of Sec. 2 reads as set out below:

"If any rural area allocated by the Public Service Commission to a corporation organized under this Act shall be included in, or become a part of any incorporated city, town or village already being served with electricity by a regulated public utility, then the members of said corporation residing or operating within such city, town or village shall lose their membership and right to receive service from said corporation."

The above quoted language tells *how* Woodruff can be "ousted". The rest of the paragraph tells on *what conditions* it can be "ousted", and it reads:

"It shall be the duty of the Commission to enforce the provisions of this Act and to provide for adequate compensation to the corporation for its loss of area and property."

The rest of the paragraph explains how *"adequate compensation"* is to be arrived at by the Commission but we are not here concerned with that feature because the extent of compensation is a matter for the Commission and not this Court to decide, and it is not an issue at this time.

The conclusion deducible from what we have said so far about Act 85 is that Woodruff should be compensated for the loss of part of its territory. With certain reservations to be noted later we understand that appellees agree with the indicated conclusion.

However appellees contend (and the Commission held) that none of the above mentioned provisions of Act 85 are of any benefit to Woodruff because of Sec. 3 of the Act. This section reads:

"Nothing in this Act nor any of the provisions of Act 342 of the Acts of the Arkansas General Assembly of 1937 (Arkansas Statutes 1937, Section 77-1131) shall in any manner restrict or impair the right of any municipality to acquire, construct, expand, maintain or operate any electric generation, transmission or distribution facilities within the corporate limits of said city, town or village in Arkansas as such limits may now exist or as such limits may exist upon the extension or expansion of the city limits of said city, town or village."

Fundamentally and generally speaking, appellees' contention in this connection is based on the fact that the Power Company is only a *lessee* and that the power plant and facilities are *owned* by the City. There can be no dispute that this is the true relationship between the two mentioned parties, even though it is correctly pointed out by appellants the lease can run for eighty years and a large portion of the utility is owned outright by the Power Company. This, say appellees, makes the City the real party in interest in this litigation and therefore not liable for compensation because of said section. We have concluded, however, for reasons set

out below, that said Sec. 3 does not admit of the interpretation placed on it by appellees.

(a)   As mentioned before, we feel that the primary purpose of Act 85 was to remedy the unjust and ''awkward'' situation previously mentioned. That being true the act should, we think, be liberally construed to effectuate that purpose. From the very nature of the business of supplying energy to customers in adjacent territories there will always be reason for rivalry between cooperatives and public utilities. Some of this rivalry may be advantageous to the general public, but the State has recognized the need for a mediator. This need has been partially met by requiring both parties to receive their allocations of territory in which to *serve* from the Commission. Through Act 85 the State has manifested an interest in seeing that both parties are treated fairly and justly. This right to *serve* enjoyed by both parties is a privilege granted by the State and is therefore subject to regulation by the State through the Commission. This is not true of a city. As we view the provisions of Secs. 1 and 2 of Act 85 they deal with the right to serve (certain territories) and not with ownership of property. The conflict here is over the right to serve a certain territory. The Power Company, under the facts and circumstances of this case, has been given the right to serve the disputed territory just as effectively as if it had bought City's plant instead of leasing it. Certainly it is true that Woodruff's loss would be the same in either event. We must conclude therefore that the provisions of Secs. 1 and 2 were meant to give relief to Woodruff under the undisputed facts of this case.

(b)   We are unable to agree with appellees' contention that the conclusion we have reached above nullifies Sec. 3 of Act 85 in that such conclusion deprives Forrest City of rights it has under said section. The answer to appellees' contention is that Forrest City at one time had the *right* mentioned in Sec. 3 (copied above)

but it saw fit to contract that *right* away, and is therefore in no position to complain now. One of the most sacred rights granted an individual by the Constitution is the right to own and keep property, but no one would contend that such individual cannot dispose of his property. As a matter of fact (as we understand the lease contract) the City still has every right (except one) mentioned in Sec. 3. It now has, under the lease, the right to "acquire", "construct", "expand" and (perhaps) "maintain" a power plant. The only *right* City does not now have is the *right* to "operate" the plant. This latter *right* the City (for what it considered its best interest) transferred, with the approval of the Commission, to the Power Company. We think the sole purpose of the legislature in inserting Sec. 3 in Act 85 was to reaffirm and protect the right of cities to own and operate their own electric plants if they so desired. Certainly Sec. 3 does not prohibit the City from selling or leasing away that right.

We now discuss some other objections raised by appellees.

*Compensation.* Having already concluded that Woodruff is, in principle, entitled to compensation under Secs. 1 and 2 of Act 85, we are not, as before indicated, concerned at this time with the measure of compensation since that was not considered by the Commission. The act provides for an exchange of territory in the manner and under the provisions therein set out. However, appellees advance the argument that Act 85, in this respect, is unconstitutional because only a court of law and not the Commission can assess damages. It is noted that the act provides for assessment of damages only in the event Woodruff desires to sell some of its property. No such event has arisen in this case as yet and it may never arise. In fact it was stated on oral argument by appellants that Woodruff was only asking for an exchange of territory. It is hardly likely therefore that this Court will ever be called upon to decide whether the Commis-

sion has the constitutional right to assess money damages since Act 103 of 1957 (not involved here) provides that cooperatives "shall not be ousted from service in said rural area". We are of the opinion however that the Commission has the right, in its sound discretion and subject to review by the courts, to effect a substitution of territory as a necessary incident to an administration of the other provisions of the act.

In the case of *Southwestern Gas & Electric Co.* v. *City of Hatfield,* 219 Ark. 515, 243 S. W. 2d 378, it was said:

"In making such determination the Commission may consider and determine questions of law, or mixed questions of law and fact, where such questions are germane and incidental to the final legislative act."

*Impairment of Contracts.* Appellees' argument is to the effect that the Power Company has acquired certain rights by and through its lease contract with the City, and that the legislature could not (by Act 85) constitutionally divest it of such rights. One answer to that argument is that nothing will be taken away from the Power Company if the Commission follows the provisions of Act 85. Theoretically at least neither party can be hurt by operation of the act. If the Power Company gives up anything of value it must not exceed the value of that which it has already received. Moreover, when the Power Company leased from the City, it knew that the State had the paramount right (through the legislature) to allocate territory between it and the cooperatives. The Power Company could not restrict that right by contracting with a third party. If it could, then the State's entire program of allocating territory would be subject to nullification.

The judgment of the trial court is reversed and the cause is remanded therefo with directions to remand to the Commission for further proceedings in accordance with this opinion.

Reversed and remanded.

HARRIS, C. J., and ROBINSON, J., dissent.

CARLETON HARRIS, Chief Justice, dissenting.

In my opinion, Forrest City had a right to lease its power plant and auxiliary equipment to the Arkansas Power & Light Company, and enter into a contract with that organization to serve the city. Under the holding of the Majority, it would certainly appear logical that the city, if and when it resumes its operation of the municipal power plant, will be forced to reimburse the power company for whatever property or assets the company gives up to the Woodruff Cooperative. This seems to me to be in conflict with Section 3 of the Act which provides that none of the provisions of Act 342 shall in any manner impair the right of any municipality to "acquire, construct, expand, maintain, or *operate*[1] any electric generation, transmission or distribution facilities within the corporate limits of said city, town or village * * *."[2] That section does not contemplate that a city shall give up anything of value in order to service its customers.[3] I feel that this Court has placed a restriction upon the cities that the Legislature did not intend.

I firmly believe in the principle set forth in Act 85 of 1955, *i.e.,* an affected cooperative should receive an exchange of territory or customers to compensate for that which it is forced to give up to a private utility, and, in the case before us, if the proof reflected that this lease contract had been entered into *after* the passage of Act 85 — or *after* the Yale & Towne organization had decided to move to Forrest City, — an entirely different situation would exist. Of course, under the evidence in this case, there can be no contention that the lease arrangement between the city and power company

---

[1] Emphasis supplied.
[2] This identical provision is also contained in Act 103 of 1957.
[3] The city did voluntarily offer to assign nine other customers to Woodruff to replace the nine taken from it, but the offer was refused.

was merely a subterfuge to take Woodruffs territory. The proof is undisputed that the city had owned and operated its municipal electric system for nearly fifty years and that this lease agreement was entered into in 1948, becoming effective in 1951 (after the power company had made extensive improvements required under the contract), at which time the company took over the operation of the city's plant and distribution system. This was several (about five) years before Yale & Towne moved into the area, and, as far as I can determine, several years before it was even contemplated that such an event would happen. While in this particular **instance,** the new territory will likely be profitable, it must be remembered, that if it were otherwise, and the city had annexed territory which would prove unprofitable for the power company to serve, under the provisions of the lease, the latter could be compelled to perform. This loss of territory was due to action initiated by the citizens of St. Francis County, resulting in the county court order of December 10, 1956, and resolution of the City Council in December, 1956. In January, 1957, in conformity with the action of the council, the mayor wrote the power company, *directing* the company to provide service to the Yale & Towne plant.

For the reasons indicated, I would affirm the judgment, and therefore, respectfully dissent.