**MONTANA–DAKOTA UTILITIES COMPA-
NY, a corporation, Plaintiff
and Appellant,**

v.

**DIVIDE COUNTY SCHOOL DISTRICT NO.
I, a public corporation, Kenneth Heckman,
et al., Defendants and Respondents.**

Civ. No. 8718.

Supreme Court of North Dakota.

Dec. 17, 1971.

Rehearing Denied Feb. 8, 1972.

Pearce, Engebretson, Anderson, Schmidt & Thames, and William S. Murray, Bismarck, for plaintiff and appellant.

McIntee & Whisenand, Williston, for defendants and respondents.

TEIGEN, Judge.

Montana-Dakota Utilities Company (hereinafter MDU) has appealed from a

summary judgment dismissing its complaint against the defendant Burke-Divide Rural Electric Cooperative, a corporation (hereinafter REC).

MDU commenced this action to enjoin Divide County School District No. 1 (hereinafter school district) and the members of its governing board, and the REC, from doing business pursuant to an electric power contract to supply the new high school, located within the city of Crosby, with electrical energy.

MDU is a public utility which has been providing central station service to the city of Crosby and its inhabitants under a franchise granted to it by said city on May 6, 1957, which franchise is to run for a term of twenty years. The franchise authorizes MDU to operate an electric distribution system in the city of Crosby "for all public and private purposes" within the geographical area of the city "as now, or hereafter constituted." The REC renders electric service in the rural area outside Crosby. The school district comprises a geographical area which includes the city of Crosby and an additional rural area.

On August 29, 1966, the REC, pursuant to the terms of a contract entered into on August 16, 1966, with the school district, erected a yard light in an open field approximately ten feet outside of the then existing city limits. The school district is the owner of the land upon which the yard light was located and also owns contiguous land within the city of Crosby. The school district was in the planning stages for using these lands for the purpose of constructing a new high school building thereon.

The city of Crosby adopted Ordinance No. 220 on September 7, 1966. This ordinance prohibits the construction, operation or maintenance of any electric facilities, or the selling, directly or indirectly, of electricity within the corporate limits of the city without a franchise. The franchise which the city had granted to MDU provides that it shall not be construed to prevent the city of Crosby from granting to any other party the right to use the streets, alleys and public grounds for like purposes and, therefore, it is nonexclusive.

On October 2, 1967, the city of Crosby annexed the land belonging to the school district upon which the yard light was located.

On February 2, 1970, the REC applied to the city of Crosby for a limited franchise to serve the area within the city of Crosby upon which the new high school building was to be constructed. The application was tabled by the city governing board. Subsequently, on May 4, 1970, the REC made a second application for a limited franchise, which was denied by the governing body of the city of Crosby. However, approximately ten days before the denial of the application for a limited franchise, the REC executed a service contract with the school district to provide electrical energy for the new high school which was going to be built. On June 1, 1970, the REC executed a separate electrical service contract with the contractor who had been engaged by the school district to construct the new high school building. Subsequently, and after the final site had been chosen, the school district commenced construction of the new Crosby high school. The site selected encompassed an area which was partially within the boundary of the city of Crosby, as it existed prior to the annexation, and partially upon land which had been annexed. The new high school building was constructed and electrical energy is being supplied to it by the REC under the contract made in May 1970.

By this action MDU seeks to enjoin the school district and the REC from carrying out the terms of the power contract entered into between them for the servicing of the new high school building, claiming that the franchise from the city of Crosby constitutes a property right and that the furnishing and sale of electricity by the REC within the corporate limits of the city of Crosby, without a limited franchise, is illegal and will cause MDU irreparable injury and damage.

Under its franchise MDU is required to maintain an efficient distribution system for furnishing electric energy for public and private use during twenty-four hours of each day (Section III of franchise) and, for that purpose, is granted the right and franchise to occupy and use the streets, alleys and public grounds of the municipality "as now, or hereafter constituted" (Section II of franchise), except that the franchise is not exclusive and shall not be construed to prevent the city of Crosby from granting to any other party the right to use the streets, alleys and public grounds for like purposes (Section IV of franchise). Although the city of Crosby retains the right to grant limited franchises, it has declined to do so. For all practical purposes, MDU's franchise, as it now stands, is exclusive, subject, however, to future decisions of the governing body of the city of Crosby.

By its answer the REC admits that it does not have a franchise from the city of Crosby, but alleges that it has the right to construct or operate electric facilities or a distribution system within the corporate limits and to sell and dispose of electricity therein under the laws of the State of North Dakota. It also alleges that its facilities were first established upon the present location on August 29, 1966, by the erection and energizing of the yard light, and that it has been doing business in the nature of providing electrical service and energy to the school district since that time; that the subsequent annexation of the area upon which such service was being rendered does not deprive it of its vested right to continue to serve the school district as the city of Crosby is considered "rural" under the statutes and is, therefore, not an area reserved exclusively as a market for MDU. It also alleges that rejection of its application for a limited franchise by the governing body of the city of Crosby is a discriminatory enforcement of the ordinance contrary to the spirit and intent of the statutes, and that Ordinance No. 220 is not valid, as it applies to the REC, because its effect would be to deprive the REC of its

property without due process of law. It also claims that it can continue to serve the school district without crossing streets, alleys or public lands. It raises another defense by which it claims that the school district is a distinct and separate public entity, an agency of the state, which has authority to select its supplier of electrical energy without regard to the dictates of the city. Lastly, it alleges that the power contract which it entered into with the school district to serve the new high school building is merely in the nature of a renewal of the contract to furnish electrical energy to the yard light.

Chapter 10–13, N.D.C.C., provides for the formation, powers and duties of electric cooperative corporations. The REC was formed under this Act. Section 10–13–01 (1), N.D.C.C., provides that a cooperative may be *"organized and operated"* [emphasis added] as an electric cooperative for the purpose of engaging in rural electrification by furnishing electric energy to "persons in rural areas who are not receiving central station service." Section 10–13–04, N.D.C.C., provides that all persons "who are not receiving central station service and who reside in rural areas proposed to be served by a co-operative organized under this chapter, shall be eligible to membership in the co-operative." This section defines a rural area as:

"* * * any area not included within the boundaries of an incorporated or unincorporated city or village having a population in excess of twenty-five hundred inhabitants at the time a corporation or co-operative commences to operate electric facilities or to furnish electric energy in such an area, and includes both the farm and nonfarm population thereof; * * *."

This section also prohibits persons, other than incorporators, from becoming members of a cooperative unless such persons shall agree to use "electrical energy or the facilities, supplies, equipment, and services furnished by a co-operative." Section 10–13–03(1), N.D.C.C., provides that an elec-

tric cooperative is empowered to transmit, distribute, sell, furnish and dispose of electrical energy "to its members, and to other persons not in excess of ten per cent of the number of its members." It is not shown in these proceedings whether the school district is or is not a member of the REC. However, we believe this question to be unimportant.

The city of Crosby qualifies as a rural area because it has a population of less than twenty-five hundred inhabitants. However, Section 10–13–01, N.D.C.C., qualifies or limits the rural areas which an electric cooperative may be "organized and operated" to serve. It may not be "organized and operated" to serve a rural area in which persons are receiving central station service. Thus an electric cooperative corporation could not be "organized and operated" to serve the city of Crosby. The question here is whether a rural area which was not being served with central station service and which was annexed to a rural area (city of Crosby) which was receiving central station service retains its status as being qualified for electric cooperative corporation service, or does its status change to that of a rural area receiving central station service.

The statutes providing for annexation of territory to cities were in existence long before the Electric Co-operative Corporations Act was enacted. When this Act was enacted, there were many cities and villages which were receiving central station service from public utility companies under a franchise arrangement. There were also many cities and villages which were furnishing their own electrical energy through city-owned electric plants. No claim has been made that electric cooperatives have an exclusive right to serve all rural areas. It is clear that the purpose for which an electric cooperative corporation may be formed is to serve persons in rural areas who are not receiving central station service.

When territory is annexed to a city the annexed territory becomes a part of the city and all ordinances are immediately in effect governing the annexed territory. Likewise, the powers of the city, which are provided by the statutes, are extended to the annexed territory. The annexed territory is as much a part of the city as the original townsite, when it becomes "a part thereof." Section 40–51.1–01, N.D.C.C. Most cities have grown since original incorporation and have annexed territory from time to time as the city grew. The annexation to a city of territory which had previously been without the city is an act of the state and such territory thereafter stands just as any other property within the city. 56 Am.Jur.2d, Municipal Corporations, Section 56.

Under the power provided by statute, the city of Crosby passed Ordinance No. 220. This ordinance prohibits any electrical supplier to furnish electricity to the inhabitants of the city of Crosby without first obtaining a franchise. The persons within the city of Crosby are receiving central station service under a nonexclusive franchise, under which franchise the central station service stands ready to extend its service to the annexed territory. The city twice has declined to issue a limited franchise to the REC.

As previously stated, an electric cooperative corporation may be organized and operated for the limited object or purpose of "furnishing of electric energy to persons in rural areas who are not receiving central station service." Section 10–13–01(1), N.D.C.C. The object or purpose for which all electric cooperative corporations may be formed, under the statutes, remains the same after their organization, in the absence of a change in the statutes. The statutes under which an electric cooperative corporation is organized become a part of its articles of incorporation. 18 Am.Jur.2d, Corporations, Section 81. There has been no change in the statutes; thus the limitation of the object or pur-

pose for which it was organized and the power to carry out its objectives remain the same. However, the characterization of the area which the electric cooperative corporation serves may change from one in which the inhabitants are "not receiving central station service" to one in which the inhabitants are receiving central station service. The authority and power of a city or village, qualifying as a rural area under the Electric Co-operative Corporations Act, to annex territory has not been limited by the Electric Co-operative Corporations Act. Where a city receiving central station service annexes territory which is being served by an electric cooperative corporation, persons within the annexed area become persons who are receiving central station service and, under the charter of the electric cooperative formed under the Act, these persons no longer qualify for membership in the electric cooperative corporation for the purpose of receiving electric service to their facilities located within the city.

The Electric Co-operative Corporations Act allows an electric cooperative to serve, in addition to its membership, an additional number of persons not in excess of ten per cent of the number of its members. Section 10–13–03(1), N.D.C.C. However, where any such person resides within or seeks service for facilities within a city defined as a rural area which is receiving central station service, such person cannot be served within the corporate limits, in the absence of a franchise, where such city has in existence an ordinance prohibiting such service in the absence of a franchise.

The foregoing explanation is the clear intent of the law. An electric cooperative corporation formed under Chapter 10–13, N.D.C.C., is not subject to the control of the public service commission. Section 49–02–01.1, N.D.C.C. It is granted the power, under the statutes, to serve all persons defined in the Act. When it incorporates it does so subject to the limitations contained in the Act, and if a person whom

it is serving is no longer qualified to receive that service, then said service, under the powers which it received from the state under the Electric Co-operative Corporations Act to serve such person, also ceases. Nowhere does the Electric Co-operative Corporations Act amend the statutes on annexation, nor does the Act amend the power of cities to serve their inhabitants with electric energy or to grant a franchise for the purpose of providing such service. The change of status of the persons served in no way affects the powers granted to the electric cooperative corporation. Its powers remain the same. Any contract which it makes with a person whom it serves is subject to the law as it existed at the time of contracting. It forms a part of the contract the same as if it were expressly incorporated therein. Permann v. Knife River Coal Mining Co., 180 N.W. 2d 146 (N.D.1970); Giese v. Engelhardt, 175 N.W.2d 578 (N.D.1970); Schue v. Jacoby, 162 N.W.2d 377 (N.D.1968); Lillethun v. Tri-County Electric Cooperative, Inc., 152 N.W.2d 147 (N.D.1967); State ex rel. Cleveringa v. Klein, 63 N.D. 514, 249 N.W. 118, 86 A.L.R. 1523 (1933); 17 Am.Jur.2d, Contracts, Section 257.

Therefore the right of the REC, under its contract, to furnish electric energy to the yard light was vested only until such time as the area upon which the yard light was located became annexed to the city of Crosby, at which time the contract to furnish electric energy terminated by operation of the law in effect when the contract was entered into. There is no violation of due process here, nor does the fact that the REC can serve without crossing any streets, alleys or public grounds within the city have any bearing on the issue before us on this appeal. Section 10–13–01(1), N.D.C.C., refers to areas in which persons are not receiving central station service. Such areas are not required to be bounded by streets, alleys or public grounds.

The REC also argues that the action of the governing body of the city of

Crosby in rejecting REC's two applications for a limited franchise to serve the annexed territory was a discriminatory, arbitrary and capricious enforcement of the ordinance, contrary to the spirit and intent of the statutes. Neither the city nor its governing body are parties to this action and we do not know on what basis the applications were rejected. The governing body of the city of Crosby has certain discretionary powers in making these decisions and we are not advised of its reasons for the decisions. However, inasmuch as they are not parties, we cannot rule on this question in this action.

■ The REC also raises the defense that the school district is a distinct and separate public entity, an agency of the state, which has authority to select its supplier of electrical energy without regard to the dictates of the city. The school district is a defendant in the main action. However, it is not a party to these summary judgment proceedings, nor does it appear from the record certified to us on this appeal that it has answered the complaint. Inasmuch as it is not a party to the summary judgment proceedings the clerk of the district court may not have included the record or papers filed by the school district in the certificate on appeal from the summary judgment. Therefore we are in no position to know what defense, if any, the school district has pleaded, or whether it permitted the matter to go by default. The defense of the REC that the school district is an agency of the state with authority to select its own supplier of electricity for its facilities within the city is logically an issue between the school district and the city. We feel that this issue is not properly before us and any decision we may render on this question, under the circumstances, does not bind the school district or the city. However, to dispose of the issue raised by the REC, we will briefly set forth its argument and our analysis of its argument.

■ The REC argues that the school district has a constitutional origin (Section 148, North Dakota Constitution), and that the school district's officers, pursuant to Section 15–29–08(1) and (2), N.D.C.C. (in effect when this case was tried), were empowered:

"1. To establish a system of public schools which shall be free to all children of legal school age residing within such district and which shall furnish school privileges equally and equitably to all pupils in the district. * * *

"2. To organize, establish and maintain such schools in said district as it may deem requisite and expedient, including high schools, and to change and discontinue the same; to acquire sites, construct buildings, and operate schools, to discontinue such schools and liquidate the assets thereof. With the approval of the state board of public school education, the board may acquire sites, construct buildings and operate schools outside its district boundaries, and discontinue such schools and liquidate the assets thereof."

It argues that the school district is an instrumentality of the state and must be allowed to carry out its functions on behalf of the state and its citizens; that included in its power to administer and maintain schools, it has the inherent power and duty to contract for electrical energy to serve the school facility, and that such a contract would be a contract between the sovereign and the supplier of the electrical energy. It cites in support thereof our decision in City of Grafton v. Otter Tail Power Company, 86 N.W.2d 197, 201 (N.D.1957). This was an action by the city of Grafton, which had its own electric light plant, against the power company on a complaint filed with the Public Service Commission for an order requiring the power company to cease and desist from supplying electric power to the Grafton State School, located within the boundary of the city of Grafton. The Grafton State School is established

and located by Section 215 of the North Dakota Constitution, whereas our public school system is established by statutes under authority of Section 147 of the North Dakota Constitution which directs the legislative assembly to make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the State of North Dakota. There is a vast distinction between these two constitutional provisions. The first makes the Grafton State School a state institution, whereas the latter directs the legislative assembly to make provision for the establishment of public schools. The *Grafton* case is not applicable here. We do not hold that the school district may not select its own supplier of electric energy for its new high school building but, under the REC's charter, limitations are provided by law that it cannot supply the new high school with electric energy unless it first obtains a limited franchise to do so from the city of Crosby, or unless the territory upon which the new high school building is located is excluded from the city under statutory procedure available for that purpose.

Lastly, the REC claims that its power contract to serve the new high school building was merely a renewal of the contract made to serve the yard light. This issue is answered earlier in this opinion where we held that a contract is terminable by operation of law where the purpose for which the contract was entered into no longer exists because of the changed status of the area being served. The new contract was entered into after the territory had been annexed and was, therefore, unlawful.

This far we are in agreement. However, apprehension has been expressed by the rest of the majority of this court that our holding may be interpreted as a precedent under which an electric cooperative, after operating in good faith in a rural area, might suffer loss of its electrical facilities installed in such rural area, without just compensation, if the area is annexed to a

city, rural in character, in which the residents are receiving central station service, and the city refuses to grant the electric cooperative a franchise to continue to serve its customers after the annexation. Therefore, the majority are in agreement that we should establish, in this case, a rule governing the interested parties relative to their respective rights and obligations where the electric cooperative has electrical installations in place within the annexed area, in order to insure that the dispossessed cooperative will not suffer loss of its investment. It must be conceded that the statutes do not provide for a contingency of this kind. It is of interest to note that the State of Missouri, by statute, provides that where an area which has been furnished electrical energy by a cooperative becomes nonrural, the municipality, or the holder of the franchise serving the area, may purchase the physical property of the cooperative and the purchase of such property terminates the cooperative's power to render service to its customers in the annexed area. Missouri Public Service Co. v. Platte-Clay Electric Coop., 407 S.W. 2d 883 (Mo.1966). It is my opinion that a decision on this question in this case would be only advisory for the reason that, according to my understanding of the record, it is agreed that the REC owns no electrical facilities located within the area annexed to the city of Crosby. It is true that the REC installed an underground line, a pad, and a transformer in order to serve the school district, and that a portion of these installations are within the area annexed to the city of Crosby. However, under the contract entered into between the school district and the REC, it was agreed that this installation would become the property of the school district as a part of the consideration for the contract. The contract, however, provides for a minimum term of five years with a minimum rate of $4,500 per year. This contract was entered into after the area was annexed and after the REC had, on two occasions, made application to the city of Crosby for a franchise, which applications were denied.

On the basis of this series of events and our holding that the contract is unlawful, it is my opinion that the REC did not enter into the contract in good faith but took a calculated risk that this court would interpret the statute in its favor. The three remaining members of the majority of this court feel differently. It is their contention that the REC made an investment when it installed these electrical facilities and, because the contract is unlawful, it will not receive the anticipated return on its investment and, therefore, may sustain a loss; that the installation was made in good faith on the basis of its interpretation of the law; and, further, it is believed that the installation may be of benefit to MDU in serving the new high school. My brethren are also of the opinion that our ruling in this decision will affect other electric cooperatives which, in good faith, have made electrical installations in rural areas that later were annexed to cities, rural in character, and which cities have refused to grant franchises permitting the cooperatives to continue to serve the areas annexed. Therefore it is reasoned that unless we, in this opinion, determine and decide the law applicable under such circumstances, there will be great confusion and losses may be sustained.

I agree that there must be some orderly method of transition where an electric cooperative has been operating in good faith in a rural area which is annexed to a city receiving central station service, and a franchise is not obtainable from the city permitting it to operate within the area annexed. My reasons for feeling that this is not a proper case in which to make this decision are set forth above. It appears to me that if there is a dispute as to ownership of these facilities, this dispute must first be resolved between the REC and the school district.

It is the opinion of the majority and, therefore, the law of this case that the REC shall be permitted to continue to serve its customers within the annexed area until such time as the electrical facilities owned by the REC and located within the area annexed, have been purchased by the franchisee, MDU. The franchisee, being a public utility, has the right to condemn these facilities under our eminent domain statutes, and it must do so unless MDU and the REC consummate a purchase and sale agreement for the physical property, otherwise the REC may continue to serve the new school.

For the reasons set forth in this opinion, the summary judgment of dismissal of the action is reversed and we direct the trial court to enter a summary judgment enjoining the REC from doing business pursuant to the electric power contract to supply electric energy to the new high school building located within the city of Crosby, but it shall stay the enforcement of the injunction until the trial court has been furnished with satisfactory evidence that the electric installations, if any, owned by the REC and located upon the area annexed to the city of Crosby, upon which the new high school building has been constructed, have been transferred to the plaintiff, MDU.

STRUTZ, C. J., and KNUDSON, J., concur.

ERICKSTAD, Judge (concurring specially).

I concur in the result of the opinion written by Judge Teigen only because it provides that the injunction against the REC shall be stayed until the REC is compensated for its property situated within the newly annexed area to the City of Crosby. Were not proper compensation paid to the REC and were not the injunction stayed until proper compensation were paid to the REC, the injunction would result in the taking of property without due process of law.

In the event that eminent domain proceedings are necessary on the part of MDU, it would be my view that until such time as the statutes are clarified that emi-

nent domain proceedings could be properly undertaken under Chapter 32–15, N.D.C.C.

Section 32–15–02, Subsection 4, N.D.C.C., permits the right of eminent domain to be exercised in the taking of electric light plants and power transmission lines.

Section 32–15–04, N.D.C.C., permits the taking of private property which has already been appropriated to public use, provided the use for which it is to be taken is for a "more necessary public use". Section 32–15–04, Subsection 3, N.D.C.C.

Also significant is Section 32–15–05, N.D.C.C., which reads:

"What must appear before property taken.—Before property can be taken it must appear:

"1. That the use to which it is to be applied is a use authorized by law;

"2. That the taking is necessary to such use; and

"3. If already appropriated to some public use, that the public use to which it is to be applied is a more necessary public use."

██ It is my view that the annexation and the lack of a franchise on the part of the REC from the City of Crosby are proof of a more necessary public use, within the requirement of Section 32–15–05, Subsection 3, N.D.C.C.

STRUTZ, C. J., and KNUDSON, J., concur.

PAULSON, Judge (dissenting).

The majority grants an injunction to MDU against the REC prohibiting the REC from serving the new high school. The injunction, however, is stayed until MDU either purchases or condemns the REC's line and equipment with which it is presently serving the high school. The injunction, therefore, is of minimal value to MDU for, in all probability, the REC will not volun-

tarily sell such property and I am unable to find any statute which gives MDU the right to condemn the REC's property.

On this subject, it is stated in 173 A.L.R. 1362, at page 1367:

"The power of a municipality or other public body to take for public utility purposes property of a public service corporation in use for its peculiar purposes must rest upon legislative authority granted either expressly or by necessary implication."

And, at page 1379, 173 A.L.R.:

"The property of one public service corporation can be taken by another under eminent domain when, but only when, the authority so to do is given by the legislature either expressly or by necessary implication."

And, at page 1384, 173 A.L.R.:

"In case the taking would amount to no more than a change in ownership, without evident advantage to the public, the authority cannot be made out by 'necessary implication' (in fact it has been doubted that express authority for such a taking could be supported)."

To the same effect is 1 Nichols, Eminent Domain § 2.2 [9] (1964), which states:

"Ordinarily, property already devoted to a public use cannot be condemned for the purpose of subjecting it to the same use in the hands of another party. This, in effect, would merely be the taking of property from one party and transferring it to another without any new benefit inuring to the public."

I can find no legislative enactment in North Dakota which would expressly grant to MDU the right to condemn the line and equipment of the REC. Neither can I find a statute which implies such right (according to 173 A.L.R. quoted above, an implied right would not suffice). Indeed, the majority even concedes that the State's statutes do not provide for a contingency of

this kind. Section 32–15–04 of the North Dakota Century Code provides that the equipment belonging to the REC would be property subject to a taking by eminent domain. However, § 32–15–05, N.D.C.C., requires that the use to which the property would be put by MDU must be more necessary than the use to which the REC is applying the property. Since both MDU and the REC would use the property for serving the high school, the use by either would not constitute a more necessary public use. Furthermore, the use of the property by the REC is benefiting the public to a greater degree since the REC under its contract with the school district has agreed to serve the school district with power at a lower rate than MDU's.

Just as the statutes of this State are silent on the right of MDU to condemn the property of the REC, the Constitution of the State of North Dakota is also silent. The right of eminent domain as set forth in § 14 of the North Dakota Constitution provides for the taking of private property for public use subject to the restrictions that such property shall not be taken without just compensation or by a method which deprives a person of property without due process of law. However, a perusal of § 14 fails to reveal that the right of eminent domain is delegable to a public utility where such delegation has not been implemented by specific statutory authority. Section 139 of our Constitution prohibits the Legislature from passing laws which do not require the consent of the local authorities before the streets and highways of a city can be used for electric power purposes, but § 139 of the North Dakota Constitution is not applicable here, since the REC's line does not parallel or cross any streets within the city of Crosby.

The irony of the majority opinion is that it apparently recognizes the authority of 173 A.L.R. quoted above, for it cites with approval the case of Missouri Public Service Co. v. Platte-Clay Elec. Coop., 407 S. W.2d 883 (Mo.1966). The statute involved in the Missouri case provides in effect that when a cooperative is serving customers who are subsequently annexed into a city, the franchisee of the city may purchase the lines and equipment of the cooperative and if the parties cannot agree on a fair price, the public service commission has the authority to fix a fair price. Even with this statute the Supreme Court of Missouri held that if the cooperative refused to sell, the court could not force it to do so because the statute did not explicitly require the cooperative to sell—it was only permissive. In view of the favorable citing by the majority of the Missouri case, it is inconceivable that a North Dakota court would order the REC to transfer its property to MDU.

In view of the importance of the issue at bar and the widespread potential consequences of the opinion of the majority, I find it imperative to point out to the majority and to the Legislature the case of Morgan Co. R. E. Mem. Corp. v. Public Serv. Co. of Ind., 255 N.E.2d 822, 824 (Ind. 1970), and the Indiana statute quoted therein, which provides as follows:

"Burns' Ind.Stat.Ann. § 55–4418a, I.C. 1971, 8–1–13–19. . . .

"Municipality annexing territory served by electric utility—Purchase of property —Condemnation.—Whenever a municipality in which a public utility (including a corporation organized, or admitted to do business, under this act [§§ 55–4401— 55–4426]) is rendering electric utility service under a franchise, license or indeterminate permit or in which a municipally owned utility is rendering electric utility service, as the case may be (such public or municipal utility being hereinafter called the 'franchised utility'), annexes additional territory and such annexed territory includes any territory in which the franchised utility was not authorized to render electric utility service immediately prior to such annexation but in which some other public utility (including a corporation organized, or admitted to do business, under this act) or municipally owned utility (such public

or municipally owned utility being here-inafter called the 'other utility') was lawfully rendering electric utility service at such time, then the franchised utility and the other utility shall promptly negotiate for the purchase by the franchised utility of the property owned by the other utility within the annexed territory and used and useful by the other utility in or in connection with the rendering of electric utility service therein. In the event that such property has not been purchased by the franchised utility within 90 days after such annexation takes place, then the franchised utility may bring an action in the circuit or superior court of the county where such municipality (or the major part thereof in area) is located against the other utility, as defendant, for the condemnation of such property of the other utility. *Until and unless such purchase or condemnation is effected, the other utility shall have authority to operate within the portion of the .annexed territory in which it was lawfully rendering electric utility service immediately prior to such annexation.* [Acts 1935, ch. 175, § 18A, as added by Acts 1953, ch. 48, § 2, p. 153.]" [Emphasis added by Indiana Supreme Court.]

In my opinion this Indiana statute represents the type of specific statutory authorization which 173 A.L.R. and the Supreme Court of Missouri would require before MDU could force the REC to sell its property.

The author of the majority opinion states that the problem of MDU's condemning or purchasing the REC's property within the city of Crosby does not arise in this case because the REC owns no property within the city of Crosby. The logic supporting this argument is that—by the contract entered into between the school board and the REC—the underground line, the pad, and the transformer became the property of the school district. The majority does not reconcile this logic with the fact that it declares the contract between the school board and the REC "unlawful". If a con-tract is "unlawful", I believe that it is therefore void and cannot transfer property. It is my opinion that the contract is not "unlawful" since it was entered into pursuant to authorization from the Legislature in Chapter 10–13 of the North Dakota Century Code. The matter of compensation for the property must still be decided, however, for the transfer of the property to the school district was a part of the consideration for the contract.

The remedy granted to MDU is not the only ground on which I disagree with the majority. I disagree with the holding of the majority that the power of a cooperative to serve its customers ceases when the customers are annexed into a city which has not granted a franchise to the cooperative. In my disagreement with this holding of the majority I am supported by nearly every jurisdiction in which I have found a case on the subject. See Mississippi Power & L. Co. v. Capital Elec. Power Ass'n, 222 So.2d 399 (Miss.1969), appeal dismissed 396 U.S. 113, 90 S.Ct. 398, 24 L.Ed.2d 308; Clarke-Washington Elec. M. Corp. v. Alabama Pow. Co., 272 Ala. 598, 133 So.2d 488 (1961); Unity Light & Power Co. v. City of Burley, 92 Idaho 499, 445 P.2d 720 (1968); Caddo Electric Cooperative v. State ex rel. Whelan, 391 P.2d 234 (Okl. 1964); Montana Power Co. v. Vigilante Electric Coop., Inc., 143 Mont. 119, 387 P. 2d 718 (1963); Missouri Public Service Co. v. Platte-Clay Elec. Coop., 407 S.W.2d 883 (Mo.1966); Pee Dee Electric Member Corp. v. Carolina P. & L. Co., 253 N.C. 610, 117 S.E.2d 764 (1961); Georgia Power Co. v. Altamaha Rural Elec. Mem. Corp., 217 Ga. 376, 122 S.E.2d 250 (1961); Woodruff Elec. Coop. Corp. v. Arkansas Pub. Serv. Com'n, 234 Ark. 118, 351 S.W.2d 136 (1961); and Town of Coushatta v. Valley Electric Member. Corp., 139 So.2d 822 (La. App.1962, on rehearing).

The sole exception to this rule is Tennessee [Franklin Pow. & L. Co. v. Middle Tenn. Elec. Mem. Corp., 222 Tenn. 182, 434 S.W.2d 829 (1968)], but it should be noted that Tennessee has a statute (T.C.A. § 6–

318) which provides that an annexing municipality shall have the *exclusive* right to provide utility functions in any territory which it annexes notwithstanding any other statute. It is interesting to note that the Tennessee statute provides the municipality with two alternatives—either to buy the cooperative's lines or else to grant the cooperative a franchise.

The Legislature of North Dakota, but not the majority of this court, recognizes that a public utility and a cooperative can both serve within the same municipality, for it provided in § 49–03–01.3, N.D.C. C., that a public utility in extending its service within a municipality "shall not interfere with existing services provided by a rural electric cooperative". Since this section (§ 49–03–01.3, N.D.C.C.) makes no mention that the cooperative must be franchised by the municipality, it cannot be presumed that a municipality can exclude a cooperative by refusing a franchise when the Legislature provides in § 10–13–04, N. D.C.C., that a municipality with less than 2500 population is a "rural area" in which a cooperative is authorized to serve.

I find it indeed regrettable that the majority should base its decision on a holding which is contrary to the overwhelming weight of authority in other jurisdictions when the controversy in the case at bar could be decided on a much narrower issue. In my opinion this case should be decided on the issue of whether or not the REC was serving the school prior to annexation. If the majority is convinced that MDU has the lawful right to serve the new Divide County High School, I would suggest that they adopt the rule that an REC cannot serve an annexed customer unless it is serving the customer prior to annexation and then hold that the furnishing of power to the light pole prior to annexation did not constitute service to the high school. Such a holding would not be contrary to the overwhelming weight of authority in other jurisdictions and would not subject the courts of this State to the avalanche of litigation which will surely result if the majority opinion, as now written, stands. If the majority opinion, as now written, prevails, I foresee litigation concerning every REC customer currently within the city limits of every city (above or below 2500 population) within the State. The result of such litigation would be an injunction prohibiting the cooperatives from serving such customers with the provision that the injunction be stayed until the appropriate franchisee buys or condemns the cooperative's lines and equipment—an occurrence which, as discussed previously, can never occur.

While I would urge the majority to adopt the narrower issue which I propose, I still cannot agree that MDU has the lawful right to serve the Divide County High School. Section 10–13–04, N.D.C.C., provides that the city of Crosby is a "rural area" in which the REC is authorized to do business. Section 40–05–01, N.D.C.C., authorizes the city of Crosby to enact ordinances which are "not repugnant to the . . . laws of this state". It is clear to me that Ordinance No. 220 of the city of Crosby is repugnant to § 10–13–04, N.D. C.C. The majority circumvents the clear intent of the Legislature by holding that customers who are annexed into a city are automatically "persons who are receiving central station service" from the franchisee even though they have never done business with the franchisee and could not have done so for the reason that the franchisee could not extend service beyond the city limits without a certificate of public convenience and necessity (§ 49–03–01, N. D.C.C.). The intent of the Legislature in using the language "persons . . . who are not receiving central station service" in § 10–13–01, N.D.C.C., was to prohibit a cooperative from serving customers who are already receiving power from another source.

In Williams Electric Coop. v. Montana-Dakota Util. Co., 79 N.W.2d 508 (N.D. 1956), at page 521, this court construed the phrase "not receiving similar service from

another utility or electric cooperative corporation" by stating:

"[This phrase] . . . has reference to *service in fact* as distinguished from ability to give service. It denotes *actual physical delivery* of electrical energy." [Emphasis added.]

The majority does not explain why the similar phrase "persons who are receiving central station service" does not have reference to service in fact as distinguished from ability or desire to provide service.

Another reason why I believe Ordinance No. 220 should not apply to the REC is that the REC had established the school district as a customer at the location of the new high school prior to the enactment of the ordinance and was serving the school district outside of the then-existing city limits.

In 6 McQuillin, Municipal Corporations [3d Ed. (1969 Revised Volume )], § 20.69, at page 184, it is stated:

"Thus, it is said that an ordinance speaks only from the time that it goes into effect. An intention that they are to have a retrospective effect will not be presumed, but must be manifested by clear and unequivocal language."

Since Ordinance No. 220 in no way purports to be retrospective, it cannot affect the business relationship between the REC and the school district which was entered into prior to the passage of this ordinance, as well as prior to the passage of the annexation ordinance.

For the reasons stated, I would affirm the judgment of the district court.