BEAUMONT *v.* FAUBUS, GOVERNOR

5-3718                              394 S. W. 2d 478

Opinion delivered October 11, 1965.

802

*Gene Worsham,* for appellant.

*Bruce Bennett,* Attorney General, *Smith, Williams, Friday & Bowen* By: *H. Friday* and *John Echols,* for appellee.

JIM JOHNSON, Associate Justice. This case challenges the validity of Act No. 35 of the First Extraordinary Session of the Sixty-Fifth General Assembly of the State of Arkansas, approved June 9, 1965. Appellant, a citizen, resident and taxpayer of Arkansas, and the holder of both serial and term bonds of the State Highway Refunding Bonds dated April 1, 1941, issued under the authority of Act No. 4 of the Acts of Arkansas of 1941, prayed for a decree declaring Act No. 35 unconstitutional and enjoining appellees from taking any action pursuant to Act No. 35 This is a class action on behalf of the citizens, residents and taxpayers of the state and on behalf of the holders of the bonds authorized by Act No. 4. Appellees are the members and secretary of the State Board of Finance.

There are presently outstanding $43,063,000 in principal amount of Act No. 4 bonds, consisting of serial bonds maturing annually on April 1, 1966 to 1972, inclusive, and term bonds maturing April 1, 1972. The serial bonds are not callable prior to maturity, but the term bonds are callable prior to maturity to the extent of $1,000,000 on April 1 in each of the years 1966 to 1971, inclusive. The Act 4 bonds bear interest at the rates of 3% and 3½% per annum and are general obligations of the State of Arkansas. There is pledged to these outstanding bonds 70% of the first $10,250,000 of highway revenues collected each year, and there are presently being maintained in the State Treasury a highway bond and interest fund for the purpose of meeting the debt service requirements of the outstanding bonds and a debt service fund consisting of collections in excess of debt service requirements. The debt service reserve fund consisting of collections in excess of debt service requirements. The debt service reserve fund currently

contains cash and investments in direct obligations of the United States in an amount in excess of $7,800,000.

Act No. 35 authorizes appellees to issue and sell general obligations bonds of the state to be known as State Highway Refunding Bonds in the amount of $43,-063,000, maturing serially in each of the years 1966 to 1972, inclusive, for the purpose of accomplishing the advance refunding of the outstanding Act 4 bonds. The entire proceeds of the sale of the refunding bonds are to be deposited in the reserve fund and appellees are required to invest the necessary amount of money in the reserve fund in United States government securities having such maturity dates and bearing interest at rates as will make available sufficient moneys to meet the debt service requirements of the outstanding Act 4 bonds as they become due (including the annual redemption of term bonds to the maximum permissible amount). The United States government securities would then be deposited with a bank or trust company under an irrevocable trust agreement whereby the principal and interest received on the securities would be used solely for paying the outstanding bonds. The remaining balance in the reserve fund (which will be at least $7,800,000) will be used for constructing and reconstructing highways and bridge in the state highway system.

The trial court disposed of the case on the pleadings by sustaining appellees' demurrer to the complaint and after appellant declined to plead further, dismissed the complaint with prejudice. This appeal followed.

For reversal appellant relies on six points.

I. Appellant urges that Act No. 35 impairs the obligation of the contract between the state and the holders of the outstanding bonds.

When the outstanding Act 4 bonds were issued and delivered, a contract was made between the state and the bondholders with the provisions of Act No. 4, the covenants and pledges executed pursuant thereto and the bonds themselves constituting a part of this contract. *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56, 79 L. Ed.

1298, 55 S. Ct. 555; *City of Little Rock* v. *Community Chest of Greater Little Rock,* 204 Ark. 562, 163 S. W. 2d 522; *Oliver* v. *Western Clay Drainage Dist.,* 187 Ark. 539, 61 S. W. 2d 442. If Act No. 35 and the action that will be taken by appellees thereunder do impair the obligation of the contract with the outstanding bondholders, it is in violation of Article I, Section 10 of the Constitution of the United States, Amendment No. 14 thereto, and Article II, Section 17 of the Constitution of the State of Arkansas. *Scougale* v. *Page,* 194 Ark. 280, 106 S. W. 2d 1023. Clearly Act No. 35 contemplates a change in the terms of the contract between the state and the Act 4 bondholders. However, not every change that affects a contract constitutes an impairment. *Seibert* v. *United States,* 122 U. S. 284, 30 L. Ed. 1161, 7 S. Ct. 1190; *Miller Levee Dist. No. 2* v. *Evers, Collector* 200 Ark. 53, 137 S. W. 2d 915. The contract clauses of both the Federal and Arkansas Constitutions are designed to preserve practical and substantial rights, not to maintain paper rights and abstract theories. *Faitoute Iron & Steel Co.* v. *Asbury Park,* 316 U. S. 502, 86 L. Ed. 1629, 62 S. Ct. 1129. Every unilateral change in a contract may amount to a techniacl breach of that contract, but not every breach is an impairment of the contractual obligation. *Morgan Construction Co.* v. *Pitts,* 154 Ark. 420, 242 S. W. 2d 812. We are dealing here with constitutional law—a limitation on the exercise of the sovereign power by a state in a matter of vital public concern *Veix* v. *Sixth Ward Bldg. & Loan Asso. of Newark,* 310 U. S. 32, 84 L. Ed. 1061, 60 S. Ct. 792)—not just ordinary principles of contract law. "This principle of harmonizing the constitutional prohibition with necessary residuum of State power has had progressive recognition in the decisions of [the Supreme Court of the United States]." *El Paso* v. *Simmons,* 379 U. S. 497, 13 L. Ed. 2d 446, 85 S. Ct. 577.

"The inescapable problems of construction have been: What is a contract? What are the obligations of a contract? What constitutes impairment of these obligations? What residuum of power is there still in the States, in relation to the operation of the contracts, to

protect the vital interest of the community? Questions of this character, 'of not small nicety and intricacy, have vexed the legislative halls, as well as the judicial tribunals, with an uncounted variety and frequency of litigation and speculations.' Story, Const. § 1375." *Home Building & Loan Asso.* v. *Blaisdell,* 290 U. S. 398, 78 L. Ed. 413.

When there is a change in the method of enforcement of a contractual obligation, the test for determining whether the obligation has been impaired is whether the new procedure is as "adequate and efficacious" as the old, *Louisiana* v. *Pilsbury,* 105 U. S. 278, 26 L. Ed. 1090, or stated differently, whether the contracting party receives a substantial equivalent of what he has been required to give up. *Woodruff Electric Coop. Corp.* v. *Ark. Public Service Commission,* 234 Ark. 118, 351 S. W. 2d 136. No mechanical yardstick can be established, but each case must be decided on its own merits. *Seibert* v. *United States, supra; Faitoute Iron & Steel Co.* v. *Asbury Park, supra; Scougale* v. *Page, supra.* As stated in *Scougale* v. *Page, supra,* (194 Ark. 280) :

" 'Impair' means to make worse, to diminish in quality, value, excellence or strength; to deteriorate. (Citing cases)."

The real obligation, from the standpoint of impairment of contractual considerations in the case of bond issues, is the obligation of the issuing authority to pay the bonds, principal and interest, when due. This is a matter that is of vital significance to the bondholders. *Faitoute Iron & Steel Co.* v. *Asbury Park, supra; Tipton* v. *Smythe,* 78 Ark. 392, 94 S. W. 678; *Fulkerson* v. *Refunding Board of Arkansas,* 201 Ark. 957, 147 S. W. 2d 980. Bondholders necessarily expect and have a right to be paid, but payment does not always have to be made from a particular fund or source. *Metropolitan Water Dist.* v. *Toll,* 1 Cal. App. 2d 421, 35 P. 2d 519; *City of Fort Lauderdale* v. *State,* 125 Fla. 89, 169 So. 584; *Oliver* v. *Western Clay Drainage Dist., supra.* As was stated by this court in *Morgan Construction Co.* v. *Pitts, supra,*

"There is a distinction between the breach of a contract and the impairment of the obligation of a contract, and where the state enacted a statute which had the effect of annulling or breaking the contract, but contained a provision for payment of the obligation, it does not constitute an impairment of the obligation of the Contract. *Caldwell v. Donaghey*, 108 Ark. 60, [156 S. W. 839]; *Morgan Engineering Co. v. Cache River Drainage District*, 115 Ark. 437, [172 S. W. 1020]."

It follows, therefore, that any change involving a substitution of security which does not diminish the prospects of, or adversely interfere with, expected payment does not constitute a contractual impairment.

With these principles in mind, we turn to the case at bar. Here, insofar as the basic right of payment is concerned, the bondholders will have obligations of the United States of America in the full amount necessary to pay their bonds, principal and interest, when due, substituted for a limited amount of cash and similar securities (approximately $7,800,000, but far less than the full amount necessary to pay the outstading bonds) and a claim against the State of Arkansas primarily secured by highway revenues to be received over the years between now and date of payment. This substitution will leave the bondholders with government securities backed by the faith and credit of the United States, which is the foundation of all money values and without which there would be no financial security. *Taxpayers and Citizens of Shelby Co. v. Shelby County*, 246 Ala. 192, 20 So. 2d 36. The bondholders' prospects of payment are not diminished. Even though we are here dealing with a general obligation of the State of Arkansas, it is obvious that there is no constitutional impairment.

Appellant on this point further urges that unless the state board of finance does its duty with honesty and accuracy, the payment of principal and interest on the outstanding bonds will be impossible, and that even if the board completely performs its duty there is always the possibility that employees of the trustee will unlawfully dispose of the United States government securities

or the proceeds thereof and that the trustee will become insolvent.

The United States government securities, and the proceeds thereof, must be handled under the provisions of a trust agreement executed pursuant to Act No. 35. In order to afford maximum protection, we construe Act No. 35 to call for the type of irrevocable trust that will not be revoked upon the insolvency of the trustee and the corpus of which will not become assets of the trustee in the event of insolvency or in any other event. An Arkansas bank or trust company can enter into such a trust agreement, Ark. Stat. Ann. § 67-610 (Repl. 1957); *Grossman* v. *Taylor,* 185 Ark. 64, 46 S. W. 2d 13, as may banks and trust companies throughout the country. See annotation, 82 A. L. R. 46. There is a presumption that officials act in accordance with the law, *Jones* v. *Capers,* 231 Ark. 870, 333 S. W. 2d 242; *Matthews* v. *Bailey,* 198 Ark. 703, 130 S. W. 1006, do their duty and that their proceedings are regular. *Dawson* v. *State Bank,* 3 Ark. (3 Pike) 505; *Rice* v. *Harrell,* 24 Ark. 402. This being true, we must assume that the necessary precautions will be taken in the preparation and execution of the trust agreement and in the taking of all other steps requisite to accomplish the purpose of Act No. 35. ''We are aware of no principle that requires us to attribute improper motives to public officers as a means of enabling us to declare an act invalid.'' *Carr* v. *Young,* 231 Ark. 641, 331 S. W. 2d 701. (See City of *Albuquerque* v. *Gott,* 73 N. M. 439, 389 P. 2d 207.) Of course, as to the question of whether the trust will be properly administered:

''In the absence of evidence to the contrary, the law will presume that a trustee intends to perform, and not to violate, his duties, and that he faithfully administers the trust. It is presumed that he does not traffic in or misappropriate the trust property or funds, and that he does not deal for his own profit with the property or moneys of a trust, expending and even wasting the same at his pleasure. It is also presumed that a trustee in accepting a trust knows the duties that he undertakes, and that if he transgresses, he must abide the conse quences.'' 54 Am. Jur., Trusts, § 605.

It is not our function to look into the wisdom of the legislative action embodied in Act No. 35 or the advisability of the public purpose sought to be accomplished (obtaining now idle funds for highway construction). Our function is to determine whether the Act meets constitutional standards. Having found that the holders of the outstanding Act No. 4 bonds will have at least the substantial equivalent in quality and accessibility of security, it follows therefore that Act No. 35 and the action proposed to be taken thereunder do not violate the impairment of contract clauses of either the Arkansas or the United States Constitutions.

II. and III. Appellant urges that an election pursuant to Amendment No. 20 to the Constitution of the State of Arkansas is necessary before the refunding bonds can be issued, and that Act No. 35 authorizes an increase in the indebtedness of the State and constitutes an illegal exaction in violation of Article XVI, Section 13 of the Constitution of the State of Arkansas.

Amendment No. 20 requires an election before the State of Arkansas shall issue bonds pledging the faith and credit of the state or any of its revenues *"except for the purpose of refunding existing outstanding indebtedness of the State."* The indebtedness to be refunded under Act No. 35 was in existence at the time of approval of Amendment No. 20 in 1934, and its refunding is expressly permitted. The same indebtedness was refunded under Act No. 4 of 1941 and appellant argues that this was the only refunding permitted. We do not agree. Bonds merely evidence an indebtedness (*City of Los Angeles* v. *Teed*, 112 Cal. App. 319, 44 Pac. 580) and we see no reason to limit the number of permissible refundings of an indebtedness in existence at the time of the adoption of Amendment No. 20. Furthermore, apart from Amendment No. 20, the power to issue the outstanding bonds in the first instance carried with it the power to refund without an election so long as the indebtedness is not increased. *Talkington* v. *Turnbow*, 190 Ark. 1138, 83 S. W. 2d 71.

Appellant argues that the bonds authorized by Act No. 35 will not be refunding bonds because the outstand-

ing bonds will not be immediately retired. To properly consider this contention, it is necessary to review the basic concept of refunding. There are two methods of refunding—by exchange and by sale. In the exchange method the issuing agency exchanges the new bonds for the old, bond for bond, with no money changing hands. In the sale method, the new bonds are sold and the proceeds are used to retire the old bonds. The exchange method is subject to obvious difficulties, such as locating the bondholders and persuading them to make the exchange. Although some courts have held that the only permissible method of refunding is by exchange, the great weight of modern authority considers this view to be unrealistic and inconsistent with present day financing requirements. See discussion in *City of Albuquerque* v. *Gott, supra*. This court has approved the concept of refunding by sale. *Fulkerson* v. *Refunding Board of Arkansas, supra*. Such refunding has long been authorized in this state (see Section 7 of Act No. 297 of 1937, as ammended; Act No. 12 of 1945) and the realities of modern day financing, obviously recognized by bondholders, are that refunding may be accomplished by sale and the bondholders' security changed from the particular pledge involved to the proceeds of the refunding bonds and steps taken to insure their availability when needed for payment. The effect of the refunding is necessarily that, as of the date of the delivery of the refunding bonds and the receipt and depositing of the proceeds thereof in trust as required, the indebtedness evidenced by the outstanding bonds is discharged insofar as the issuing authority is concerned and is no longer outstanding. As was said in *City of Albuquerque* v. *Gott, supra,*

"The majority rule, which we feel is more persuasive, and in accordance with the practicalities is supported by decisions from Florida (Fleeman v. City of Jacksonville, 1939, 140 Fla. 478, 191 So. 840; State v. City of Miami, 1944, 155 Fla. 6, 19 So. 2d 410; State v. City of Orlando (Fla. 1955), 82 So. 2d 874; State v. City of Melbourne (Fla. 1957), 93 So. 2d 371); South Carolina (Kalber v. Stokes, 1940, 194 S. C. 339, 9 S. E. 2d 785);

Louisiana (State ex rel. Maestri v. Cave, 1939, 193 La. 419, 190 So. 631); Alabama (Taxpayers and Citizens v. Shelby County, [*supra*], 1944, 246 Ala. 192, 20 So. 2d 36); South Dakota (National Life Ins. Co. v. Mead, 1900, 13 S. D. 37, 82 N. W. 78); Idaho (Veatch v. City of Moscow, 1910, 18 Idaho 313, 109 P. 722); Texas (City of McAllen v. Daniel, 1948, 147 Tex. 62, 211 S. W. 2d 944); and Arizona (Citrus G. D. Assn. v. Water Users' Assn., 1928, 34 Ariz. 105, 268 P. 773; Allison v. City of Phoenix, 1934, 44 Ariz. 66, 33 P. 2d 927, 93 A. L. R. 354).''

See also annotation, 97 A. L. R. 452—457. Thus, there appears to be nothing novel about the advance refund-in concept, since refunding by sale normally is accomplished by delivering the refunding bonds at one time and using the proceeds to actually pay the bonds being refunded later. Certainly as long as a public purpose is being served and the substituted security is equivalent or better there are no constitutional infringements. It is undisputed in the case at bar that there will be no increase in indebtedness in that the proceeds of the refunding bonds will be invested in United States government securities simultaneously with the delivery upon such terms that the principal and interest received from the securities will at least equal the principal and interest payments on the outstanding bonds. The bonds issued under Act No. 35 will be refunding bonds and no election pursuant to the provisions of Amendment No. 20 is required. There will be no increase in indebtedness and there is no illegal exaction.

IV. Appellant urges that Act No. 35 authorizes the lending of the credit of the state in violation of Article VI, Section 1 of the Constitution of the State of Arkansas, as amended by Amendment No. 13.

The state is using its credit under Act No. 35, not lending it. There is no violation of Article XVI, Section 1. *Hays v. McDaniel, Treasurer*, 130 Ark. 52, 196 S. W. 934.

V. Appellant urges that Act No. 35 delegates the legislative power of the state to the board of finance in

violation of Article V, Section 1 of the Constitution and Amendment No. 7 thereto.

The distinction between the unpermitted delegation of legislative power and the permitted conferring of authority or discretion as to its execution has been repeatedly recognized by this court. *Fulkerson* v. *Refunding Board of Arkansas, supra.* The authority conferred upon appellees is purely ministerial and falls within the permitted category. The appellees have not been given unlimited authority to act, or any authority whatever to legislate. Act No. 35 is not subject to the objection that it unconstitutionally delegates legislative power. See *Miles* v. *Gordon,* 234 Ark. 525, 353 S. W. 2d 157; *McArthur* v. *Smallwood,* 225 Ark. 328, 281 S. W. 2d 429.

VI. Appellant finally urges that Act No. 35 violates Amendment No. 7 to the Constitution of the State of Arkansas by declaring an emergency on legislation creating vested rights.

This argument is moot because Act No. 35 became effective on September 6, 1965, in any event. In the situation of an invalid emergency clause, an Act takes effect when it would have become effective without the emergency clause. *Barber* v. *State,* 206 Ark. 187, 174 S. W. 2d 545. It appears that no action has yet been taken under Act No. 35.

Finding no error, the decree of the learned Chancellor should be, and hereby is, affirmed.

McFADDIN, GEORGE ROSE SMITH and WARD, JJ, dissent.

GEORGE ROSE SMITH, J., (dissenting). Almost twenty-five years ago the State, pursuant to Act 4 of 1941, refunded its bonded highway debt. The State pledged its full faith and credit to the payment of the refunding bonds. Some $43,000,000 worth of those bonds are still unpaid. They are secured by a pledge of certain highway revenues and of the Debt Service Reserve Fund, now amounting to more than $7,800,000, which is the cumulative excess of the pledged revenues over the amounts that have been needed to service the bonds.

By Act 35, now before us, the State is attempting to revoke its pledge of the Debt Service Reserve Fund so that those monies can be used for highway construction. The question here is whether that maneuver can be accomplished without an impairment of the State's contract with is bondholders. I regret that I cannot agree with the majority's conclusion that Act 35 is constitutional:

Act 35 is long, but its plan for what the briefs call the "advance refunding" of the 1941 bonds really involves only four essentially simple steps:

First: The State will sell $43,000,000 of new bonds for which it will again pledge its full faith and credit.

Second: The proceeds from this new bond issue will be invested in $43,000,000 worth of United States Government bonds so chosen that their interest and principal payments will be sufficient to pay the interest and principal of the 1941 refunding bonds as they come due.

Third: The Government bonds will be deposited with a bank under a trust agreement by which that bank will promise to use the interest and principal to pay the 1941 State bonds.

Fourth: When the first three steps have been completed, Act 35 declares that the State's liability upon the 1941 refunding bonds will be discharged. Thereafter the holders of those bonds will have no security except whatever rights they may have under the trust agreement. At the same time the State will make the $7,800,000 Debt Service Reserve Fund available for highway construction.

Among the several attacks that are made upon Act 35 I think that at least two should be sustained under the constitutional prohibition against the impairment of contracts.

One: Not the least important element in the security that was given in 1941 to the State's bondholders was the pledge of the State's full faith and credit. The pledge meant that if the specific liens upon the highway reve-

nues and upon the Debt Service Reserve Fund should fall short of discharging the bonded debt, the State gave its word that its other available resources would be used to make good the deficiency. By Act 35 the State admittedly repudiated its promise. (No doubt that action was taken to avoid the need for submitting the new bond issue to the voters for their approval in a state-wide election. If the State's faith and credit had been pledged to both bond issues Amendment 20 to our constitution would have required such an election.) In my judgment the State's unilateral decision to abrogate its promise to its creditors is on its face an impairment of the obligation of its contract with those creditors.

Two: The majority justify the State's abrogation of its 1941 agreement upon the theory that Act 35 provides the bondholders with a new form of security that is equally as good as the one they have lost. It seems to me that, to reach this conclusion, one must read a great deal into Act 35 that is actually not there.

Under Act 35 the sole security for the 1941 bonds will be the trust agreement created by Section 11 of the act. What do we know about that trust agreement? At this point, almost nothing, for the act contains but a single vague sentence about the trust agreement. In essence that sentence reads as follows: "[The following transaction shall be effected:] The deposit with a bank or trust company that is a member of the Federal Deposit Insurance Corporation (which bank or trust company shall be selected by the [State Board of Finance]) under an irrevocable Trust Agreement by and between the Board and said bank or trust company (called "Trust Agreement") of all of the direct obligations of the United States of America acquired under (b) above, upon such terms as shall insure that said investments and the proceeds thereof be used solely for the payment of the principal of, interest on and paying agents' fees in connection with the outstanding bonds, which Trust Agreement shall contain such terms and provisions as the Board shall determine necessary to insure the sole use of the investments and proceeds for the above specified purpose." That is all. There is no more.

It is impossible for me to understand how the majority can declare that this single sentence, with its cavalier treatment of a trust fund amounting to forty-three million dollars, provides the bondholders with a measure of security equivalent to what has been taken away from them. Neither the majority members of this court nor any one else in the world knows what the trust agreement is going to provide. The Board may select as the trustee the smallest bank in the state that is a member of the FDIC. What provision will there be against the possibility that the Government bonds may be stolen or destroyed by fire? What safeguard will there be against the possibility of embezzlement by those persons in the bank who must unavoidably handle the cash derived from the Government bonds? Why is there no requirement that the trustee bank give a fidelity bond? Is it because the State is unwilling to make an appropriation for the premium upon such a huge bond?

Most important of all, what assurance have the holders of the 1941 refunding bonds that the trust agreement will fairly protect their property rights? This is the one question that can be answered. The answer is: ''None.'' This is so because the bondholders will have no voice in the preparation of the trust agreement. That agreement is to be between the trustee bank and the State Board of Finance. The bank, on the one side, will naturally be primarily interested in the paying agent's fees that it will receive for handling forty-three million dollars, plus additional millions in interest. The Board, on the other side, is composed of five State officers whose loyalty is understandably and properly to their employer, the State. Thus no one concerned with the drafting of the trust agreement will have any really vital reason for seeing that the bondholders are protected as they should be.

It must be remembered that when the trust agreement is finally prepared the new $43,000,000 refunding issue will already have been sold, the State's 1941 pledge of its full faith and credit will already have been revoked, and the holders of the 1941 bonds will already have been stripped of all their security except those

rights that the trustee bank and the Board may, in their uncontrolled discretion, see fit to give them. In my opinion there is no sound basis upon which this court can declare today, as the majority are doing, that Act 35 does not and cannot adversely affect the rights of the owners of our 1941 highway refunding bonds. Having that conviction, I must dissent.

McFADDIN and WARD, JJ., join in this dissent.