BERVEN, Plaintiff v. BOARD OF REGENTS OF EDUCATION
et al., Defendants

(201 N. W. 2d 218)

(File No. 11062.  Opinion filed October 10, 1972)

**Loucks, Oviatt, Bradshaw & Green,** Watertown, for plaintiff.

**Horace R. Jackson,** of **Whiting, Lynn, Jackson, Shultz, Ireland & Lebrun,** Rapid City, for defendant; **David G. Williams,** Chicago, Ill., of counsel.

WOLLMAN, Judge (on reassignment).

This is an original action brought by plaintiff on his own behalf and on behalf of all other persons similarly situated. He asks that the Board of Regents of Education of the State of South Dakota be prohibited from refunding and consolidating into one institutional revenue bond issue in the amount of $3,957,000 the

outstanding obligations on six previous revenue bond issues by the Board of Regents for and in behalf of South Dakota State University, secured by a pledge of the net income from all of the student housing and eating facilities constructed with the various bond issues to retire the consolidated bond issue. Special Resolution No. 48-1971 was adopted by the Board of Regents at a meeting held on October 21 and 22, 1971 under the authority granted by Ch. 134, Laws of 1971 (SDCL 13-51A). The six bond issues referred to are described in the resolution of consolidation as follows:

"(i) The dormitories completed in 1959 with the proceeds of $2,050,000 South Dakota State College of Agriculture and Mechanic Arts Dormitory and Apartment Revenue Bonds of 1957, Series B, authorized under Special Resolution No. **10-1958,** adopted **February 13, 1958.**

(ii) The student dormitory and dining hall completed in 1962 with the proceeds of $1,700,000 South Dakota State College of Agriculture and Mechanic Arts Dormitory and Dining Hall Revenue Bonds, Series 1961, authorized under Special Resolution No. 27-1961, adopted June 16, 1961.

(iii) The student dormitory and dining facilities building completed in 1965 with the proceeds of $1,875,000 South Dakota State College Dormitory and Dining Hall Revenue Bonds, Series B of 1963, authorized under Special Resolution No. 65-1964, adopted June 19, 1964, and as amended by Special Resolution No. 94-1964 adopted August 5, 1964.

(iv) The student dormitory completed in 1967 with the proceeds of $1,275,000 South Dakota State University Dormitory Revenue Bonds, Series B of 1964, authorized under Special Resolution No. 174-1965 adopted March 25, 1965.

(v) The student dormitory completed in 1969 with the proceeds of $2,800,000 South Dakota State University

Dormitory Revenue Bonds, Series B, of 1967, authorized under Special Resolution No. 156-1967 adopted July 20, 1967.

(vi) The married student housing completed in 1970 with the proceeds of $620,000 South Dakota State University Married Student Housing Revenue Bonds, Series 1970, authorized under Special Resolution No. 94-1970, adopted July 16, 1970."

SDCL 13-51A-15 provides that the issuance of any bonds issued pursuant to SDCL 13-51A may be secured by a pledge of and lien on all or any part of the income and revenue derived from:

"(1) fees, rentals and other charges from students, staff members and others using or being served by, or having the right to use or the right to be served by, or to operate, any project,

(2) health, hospital, medical, laboratory, admission, student activities, student services, and all other fees collected from students matriculated, registered or otherwise enrolled at and attending each such institution and

(3) rentals from any facility or building leased to the United States of America."

SDCL 13-51A-23 provides:

"Nothing in this chapter shall be construed to authorize the board or any institution to contract a debt on behalf of, or in any way to obligate, the state of South Dakota, or to pledge, assign or encumber in any way, or to permit the pledging, assigning or encumbering in any way, of appropriations made by the Legislature of the state of South Dakota."

SDCL 13-51A-24 provides:

"All bonds issued pursuant to this chapter shall be obligations of the board payable only in accordance with

the terms thereof and shall not be obligations general, special or otherwise, of the state of South Dakota. Such bonds shall not constitute a debt, legal or moral, of the state of South Dakota, and shall not be enforceable against the state, nor shall payment thereof be enforceable out of any funds of the board, or of any institution, other than the income and revenues pledged and assigned to, or in trust for the benefit of, the holder or holders of such bonds."

The resolution authorizing the consolidated bond issue provides for the payment of the bonds in the following language:

"The Board of Regents of the State of South Dakota hereby covenants with the registered owner of this Bond that it will keep and perform all the covenants and agreements in the Bond Resolution, and hereby irrevocably obligates itself to administer the said revenue, fees and receipts derived from the operation of said Housing and Auxiliary Facilities, as provided for in and by the Bond Resolution, and to establish from time to time parietal rules, rents, fees and charges for the use of the said Housing and Auxiliary Facilities and to maintain and collect rents, charges and fees sufficient to pay the reasonable cost of operating, maintaining, insuring, and repairing of said Housing and Auxiliary Facilities, and pay the principal of and interest on all said Revenue Bonds which by their terms are payable from such revenues, until all of such Bonds have been paid in full, both as to principal and interest."

and it defines gross revenues and net revenues in the following language:

"(E) 'Gross Revenues' used in connection with the Housing and Auxiliary Facilities shall mean and include all revenues, income, receipts, profits, rates, rents, charges fees and returns to be received from the continued use and operation of the Housing and Auxiliary Facilities.

(F) 'Net Revenues' used in connection with the Housing and Auxiliary Facilities, shall mean that portion of the Gross Revenues received from the continued operation, use and maintenance thereof remaining after providing sufficient funds for the reasonable and necessary cost of currently maintaining, repairing, insuring, and operating the same, including the Operating Reserve."

The bonds to be issued under the resolution here in question state on their face: "This Bond is not a general obligation of the Board of Regents of the State of South Dakota, or the State of South Dakota, and does not create an indebtedness, legal or moral, of the State of South Dakota." The resolution states that such bond "does not create an indebtedness, legal or moral, of the State of South Dakota, and is payable only from the net revenues, fees and receipts to be derived from the operation of the said Housing and Auxiliary Facilities, and is not payable out of or enforceable against the State of South Dakota, or any fund created or maintained directly or indirectly from taxation."

The bond issues being refunded have had substantial payments made on them in varying amounts over the years since their issuance, all from the revenue of the facility provided by each issue, so there is less now owing than the amount of the original bonds. It has been stipulated that the following is a recapitulation as to various aspects of the project contemplated by Special Resolution No. 48-1971:

| Year of Original Resolution | Amount of Original bond issue | Principal balance owed Fall 1971 | Series of bonds in proposed new issue |
|---|---|---|---|
| 1958 | $2,050,000 | $1,665,000 | A |
| 1961 | 1,700,000 | 1,341,000 | B |
| 1964 | 1,875,000 | 1,397,000 | C |
| 1965 | 1,275,000 | 1,174,000 | D |
| 1967 | 2,800,000 | 2,760,000 | E |
| 1970 | 620,000 | 620,000 | F |

Plaintiff's position is that Ch. 134 of the Laws of 1971 is unconstitutional and that the proposed refunding of the bond issues is void because of the debt limitation established by § 2, Art. XIII of the Constitution of South Dakota. Article XIII, § 2 reads in pertinent part:

> "For the purpose of defraying extraordinary expenses and making public improvements, or to meet casual deficits or failure in revenue, the state may contract debts never to exceed with previous debts in the aggregate one hundred thousand dollars  *  *  *  and provision shall be made by law for the payment of the interest annually, and the principal when due, by tax levied for the purpose or from other sources of revenue *  *  *."

The question, then, is whether the consolidated revenue bond issue creates a debt within the meaning of Article XIII, § 2. In State College Development Ass'n v. Nissen, 66 S.D. 287, 281 N.W. 907, this court held that the issuance of bonds for the construction of two dormitories on the campus of State College payable out of the net revenues of the dormitories to be built did not create an indebtedness within the meaning of the constitutional debt limitation. The court stated that:

> "  *  *  *  under the facts in the instant case no contingency could arise imposing an obligation, moral or otherwise, upon the State of South Dakota, to levy a tax or to appropriate funds to pay any loss that may result from the transactions between the Board of Regents and the plaintiff association. Title to the buildings erected on the campus of the college will be in the State from the time of their erection and no encumbrance or lien thereon will be created. The bonds will not constitute a general obligation against the State. The buildings will be made available to the State under the proposed contract enabling the State to pay for their construction and equipment from earnings accruing from their operation." 281 N.W. 907, 909.

In Boe v. Foss, 76 S.D. 295, 77 N.W.2d 1, the court had before it a resolution of the Board of Regents to construct a women's dormitory, a men's dormitory and an apartment building on the campus of South Dakota State College, the construction to be financed by revenue bonds issued pursuant to the provisions of Ch. 49, Laws of 1955. The bond resolution provided that the bonds were to be payable solely from and secured by a pledge of the net revenues of the buildings authorized to be constructed and by a pledge of the net revenues of all or such of the existing dormitory facilities at said institution not otherwise pledged. In holding that the Board of Regents could not pledge the income from existing dormitory facilities, the court stated that:

"By their proceedings the Board of Regents has pledged to a special fund and to the payment of these revenue bonds, not only the net income of the facilities to be acquired with their proceeds, but also the net income, in an amount of not less than $500,000 of the dormitories presently in use at the college. Conceding that the holders of the proposed bonds must look solely to the special fund thus created for payment of principal and interest, the question arises whether, within the meaning of Sec. 2, Art. XIII, a debt is incurred because the Board of Regents, an agency of the state, with the sanction of the legislature, is pledging in payment of these bonds resources and revenues belonging to the state in addition to the net income of the property to be acquired with their proceeds. Because of that pledge of additional property and resources of the state, we are solemnly persuaded that such a debt will be incurred." 77 N.W.2d 1, 5.

The question, then, is whether our holding in Boe v. Foss is controlling here. We conclude that it is not. Without question the Board of Regents originally could have constructed the student facilities simultaneously and financed their cost by one revenue bond issue. This was expressly decided in State College Development Ass'n v. Nissen, supra, in which the court said, "The only liability is against a special fund which is to be made up exclusively of net rentals. No violation of the constitutional pro-

vision against indebtedness is involved." Such a course of action would also have been constitutionally permissible under Boe v. Foss.

Consolidation and refunding does not change the nature of the bonds, nor does it enlarge the obligation of the state. Only the revenue from rentals of the facilities will be pledged. This court held in Gross v. City of Bowdle, 44 S.D. 132, 182 N.W. 629, that bonds issued to refund special assessments did not constitute a "debt" within the meaning of our constitution, as "These bonds will be paid by the funds to be collected from the said special assessments, and not by any general taxes * * *." The same principle applies in the present case. See also Hyde v. Ewert, 16 S.D. 133, 91 N.W. 474; Hughes County, S. D. v. Livingston, 8 Cir., 104 F. 306, cert. denied 181 U.S. 623, 21 S.Ct. 926, 45 L.Ed. 1033; National Life Ins. Co. of Montpelier v. Mead, 13 S.D. 37, 82 N.W. 78.

The power to issue the various revenue bonds in the first instance carries with it the implied power to refund the same according to the dictates of good fiscal management and control so long as no "debt" in the constitutional sense is created. See Beaumont v. Faubus, 239 Ark. 801, 394 S.W.2d 478; Talkington v. Turnbow, 190 Ark. 1138, 83 S.W.2d 71.

To summarize, Boe v. Foss holds that revenues from existing dormitories which are constructed by state funds derived from taxation cannot be pledged to help pay for the cost of new dormitories. This restriction should not be held to apply to existing dormitories and student facilities constructed with the proceeds of revenue bonds. No other source of revenue is being pledged and the state is under no obligation, legal or moral, to repay the same from any other source of revenue. We conclude, therefore, that the Board of Regents may legally consolidate and refund the existing revenue bonds. The refunding of the existing revenue bonds does not create a "debt" in violation of our Constitution, as the obligation of the state is not changed by the refunding and consolidation in any manner. To hold otherwise would be to extend the rule in Boe v. Foss to an unnatural and illogical degree.

In conclusion, then, in holding that the refunding of the existing revenue bond issues by consolidating the obligations into one revenue bond issue secured by the pledge of the net income from the facilities constructed with the proceeds from the several bond issues does not create a debt within the meaning of Article XIII, § 2 of the Constitution, we are limiting Boe v. Foss to its particular facts. We confine our holding here to the precise facts before us and we intimate no view as to the constitutionality or legality of any other provision contained in SDCL 13-51A.

The writ of prohibition is denied.

HANSON, P. J. and DOYLE, J., concur.

BIEGELMEIER, J., dissents.

WINANS, J., dissents.

BIEGELMEIER, Judge (dissenting).

I join in Judge Winans' dissent which is a shortened version of his proposed opinion in this appeal. In it he carefully reviewed the opinions of this and other courts and lucidly demonstrated that the course of action of defendant Board in passing the resolutions under the authority of Ch. 134, S.L.1971 was unconstitutional. My thoughts on this subject have not changed and are found in my dissent and the dissent of Judge Rentto in McFarland v. Barron, 1969, 83 S.D. 639, 164 N.W.2d 607. It is no different for the state to authorize the refinancing of a bond issue (debt to me) of $8,957,000 on five buildings where four of them are subject to that lien and one is free of incumbrance than it is when each may be subject to liens varying from $50,000 (or less) to three or four million dollars. The people of the state are owners of a building worth a million dollars subject to a debt of $50,000 one day (an equity of $950,000) and the next day that equity disappears and the building is subject to the $8,957,000 claim.

I am mindful of the semantics that each bond states on its face it is "not a general obligation of the Board  *  *  *  or the State of South Dakota, and does not create an indebtedness

\* \* \* of the State". But the fact and law is that the bond-holders can effectively take over the buildings to force payment of their claims.

It seems the legislature, by the fruitfulness and inventiveness of the human mind, has by one device or another slowly eroded the proscription or limit of debt in Section 2, of Art. XIII of our Constitution so that "debts" are not "debts" — they are merely something you must pay.

WINANS, Judge (dissenting).

I dissent, initially by challenging the legal theory of the first sentence of the majority summary. Boe v. Foss did not limit itself to the proposition that existing dormitories constructed by state funds derived from taxation cannot be pledged to help pay the cost of new dormitories. Nothing was said in Boe about buildings having to be constructed by funds from taxes to make them subject to the constitutional debt provision. True it is that buildings built by taxes may not be so pledged, but Boe must be read more comprehensively than that. To sharpen the point a bit, I doubt very much that the campanile on the campus of SDSU, gift of a benefactor, or property given by the Federal Government, could be pledged for the payment of the bonds subject matter of the lawsuit. A dormitory would not present a different problem inso-far as Boe is concerned, which says:

"More is involved in the case at bar. By their pro-ceedings the Board of Regents has pledged to a special fund and to the payment of these revenue bonds, not only the net income of the facilities to be acquired with their proceeds, but also the net income, in an amount of not less than $500,000 of the dormitories presently in use at the college. Conceding that the holders of the proposed bonds must look solely to the special fund thus created for payment of principal and interest, the question arises whether, within the meaning of Sec. 2, Art. XIII, a debt is incurred because the Board of Regents, an agency of the state, with the sanction of the legislature, is pledging in payment of these bonds resources and revenues belong-

ing to the state in addition to the net income of the property to be acquired with their proceeds. Because of that pledge of additional property and resources of the state, we are solemnly persuaded that such a debt will be incurred."

The key words in the quote from Boe, above, are: "* * * is pledging in payment of these bonds resources and revenues belonging to the state in addition to the net income of the property to be acquired with their proceeds."

In State College Development Ass'n v. Nissen, 66 S.D. 287, 281 N.W. 907, where the Board of Regents had proposed to finance the erection of two dormitories by using the net revenue from the dormitories; this court held that the issuance of bonds for the construction of the two dormitories on the campus of the State College of Agriculture and Mechanic Arts, now SDSU, payable out of the revenues of the dormitories to be built, did not create an indebtedness within the meaning of the Constitutional Debt Limitation. The Court stated:

" * * * but under the facts in the instant case no contingency could arise imposing an obligation, moral or otherwise, upon the State of South Dakota, to levy a tax or to appropriate funds to pay any loss that may result from the transactions between the Board of Regents and the plaintiff association. Title to the buildings erected on the campus of the college will be in the State from the time of their erection and no encumbrance or lien thereon will be created. The bonds will not constitute a general obligation against the State. * * It has been held in other jurisdictions that the pledge of revenues from a utility or other property in payment thereof does not constitute an indebtedness."

Important words in the quote from Nissen are: "Title to the buildings erected on the campus of the college will be in the State from the time of their erection * * *."

The Legislature has recognized the principle of ownership of the buildings they have authorized the Regents to construct on a revenue bond basis. For instance, Chapter 49 of the Laws of 1955, which was an act "Authorizing Board of Regents To Construct Dormitories on Revenue Bond Basis". Under this act, amended from time to time, buildings have been constructed on a revenue bond basis. It is specifically provided in Chapter 49, "The title to all such land and buildings shall be in the name of the state of South Dakota." Incidentally, or not so incidentally, this is the act construed in Boe v. Foss.

The decisions of this Court announced in Nissen and Boe are based on what is known as the limited special fund doctrine, which has been applied in other cases in South Dakota: Mettet v. City of Yankton, 71 S.D. 435, 25 N.W.2d 460; Clem v. City of Yankton, 83 S.D. 386, 160 N.W.2d 125.

Boe, supra, is authority for the proposition that income pledged to pay bonds from property presently owned by the state is a pledge of the resources of the state, and is consequently a prohibited debt within the meaning of the Constitution, and is also authority together with State College Development Association, supra, for the proposition that pledging income to be derived from the facility built by revenue bonds to the payment of those building bonds does not create a constitutionally prohibited debt.

In McFarland v. Barron et al., 1969, 83 S.D. 639, 164 N.W.2d 607, this Court by a divided decision sustained bonds proposed to be issued by the South Dakota Building Authority to construct and equip buildings at state institutions with the power to lease the building to state agencies under leases providing that rent be payable solely from appropriations to be made by the Legislature. The Court held that this lease arrangement did not violate debt limitation provisions of the Constitution. A clear distinction was made between the factual situation of the McFarland case and the Boe case, supra. In McFarland the obligation of the state to pay the rents, which would in turn pay off the bonds, was optional with the legislature. The Court held:

"The leases must contain a provision that rents shall be payable solely from appropriations to be made by the legislature and any revenues derived from the operation of the leased premises. In the event of nonpayment of rents by the State, the building or facility may be leased to others for suitable purposes. A lease may be made for a term of one year from the time a building is completed and ready for occupancy, with an option to the lessee to extend the term for one year from the expiration of the original term and for one year from the expiration of each extended term until the original term of the lease has been extended for a total number of years to be agreed upon at a rental which, if paid for the original term and for each of the full number of years for which the term of the lease may be extended, will amortize the total cost of the erection of the building and appurtenances."

Rental payments could come only if the appropriations were made. The matter would be within the exclusive control of the legislature. It is clear from a reading of the McFarland decision that while the court divided in reaching its decision, the judges were unanimous in support of Boe v. Foss, supra.

The majority opinion cites Beaumont v. Faubus, 239 Ark. 801, 394 S.W.2d 478, as authority for the position they take. There is no similarity in that case and the one we decide for South Dakota. In Beaumont they are discussing bond issues where the "full faith and credit" of the State of Arkansas is pledged to the payment of the refunding bonds, which were also "full faith and credit" bonds. We are involved in revenue bonds where originally at least no "full faith and credit" of this state is involved. If our case is a "full faith and credit" of the state of South Dakota, could there be any question that such bonds would not be considered debt and in excess of the constitutional limits?

They also cite Talkington v. Turnbow, 190 Ark. 1138, 83 S.W. 2d 71. This case also throws no light on our problem. The bonds there discussed were "valid, outstanding subsisting obligations

against said county". The bonds in our case that are refunded are not "valid, outstanding subsisting obligations against" the state of South Dakota.

Many of the states which originally embraced a limited or special fund doctrine have later rejected it, and have adopted the "broad special fund doctrine". We have been asked to reconsider. We find in 16 Am.Jur.2d, Constitutional Law, § 60, beginning at page 232, the following rules governing uniformity of construction:

"Constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action. Thus, a cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, even though the circumstances may have so changed as to make a different rule seem desirable. In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Moreover, the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders.

It has been said that the rule of stare decisis is peculiarly applicable in the construction of written constitutions."

The question here is whether there can be a consolidation of the bonds and the payment thereof from the consolidated revenues without violating Boe, supra. Under the facts before us the bonds for the dormitory authorized in 1958 will be replaced by bonds which pledge the income from the facility constructed in 1958 to pay the proposed bond issue. This commits the 1958 structure in

substance to the payment of this consolidated bond issue, without which the facility constructed with the 1958 bonds will be free, when the 1958 bonds are paid off, to contribute to the state general fund. The same is true for the other structures. As the bonds are paid off for each particular structure, the income will contribute to the state general fund. In the only case law we could find on this question of consolidation, the Rhode Island Supreme Court in 1962, Opinion To Governor, 94 R.I. 464, 181 A. 2d 618, held this could not be done. The court was requested by the governor to advise whether the board of trustees of state colleges could modify the pledge previously made of net revenues of existing federally financed auxiliary academic service enterprises at the University of Rhode Island, so as to consolidate them to meet the consolidated debt service and whether a pledge by the Board of Trustees from an existing nonfederally financed auxiliary academic service facility to meet debt service on an existing or future federally financed service facility would create a prohibited debt. The Court held that the consolidation violated the debt limitation of the Rhode Island Constitution and reviewed the factual background as follows:

> "The construction of the Memorial Union was financed by contributions from students, the alumni and friends of the university. The housing facilities were financed by loans from the Federal Housing and Home Finance Agency created by an act of Congress, for which bonds were issued by the trustees. Each housing unit was the subject of a separate bond issue and the obligations so incurred were to be discharged by the application of the revenue received from students renting the particular unit involved.
>
> Although the housing accommodations of the several units are comparable, the rentals charged students are not uniform because of the varying costs of construction resulting from site conditions. Since the interest and debt service charges payable to the federal agency must be met for the financing of each particular unit by the revenue received therefrom, obvious inequities result from the lack of uniformity in the amount of rent charged.

In an effort to equalize room rental rates the board has requested the Federal Housing and Home Finance Agency to consent to a combining of the several loan agreements, as it says, 'into one consolidated loan agreement, and in so doing, to utilize the revenue of the more revenue-productive project or projects to augment amortization of the less revenue-productive projects.' It appears that the proposal has received tentative approval.

Furthermore, the board is planning to construct an addition to the Memorial Union and additional dormitories for men. Such construction is contemplated within the immediate future and application has been made to the Federal Housing and Home Finance Agency to include the financing thereof in the proposed consolidated loan. We are further informed that the finance agency has reserved the necessary funds pending a determination of the question of consolidation. Although the revenue hereafter received from the Memorial Union, which revenue comprises the proceeds from the book store, snackbar, bowling alleys and other recreational facilities, is to be allocated in redemption of the pledge contained in the proposed consolidated agreement, the Memorial Union addition is to be partially financed by applying thereto the sum of $100,000 which has been accumulated from students' fees and such proceeds as herein previously enumerated."

After quoting the Rhode Island statute which generally provided for appropriation by the general assembly to meet a school's budget to the extent it was not met by student fees, operation of dormitories and auxiliary educational enterprises, etc., the Court stated the following:

"It is clear from the foregoing that revenue from housing and recreational facilities, not otherwise encumbered, is to be available to the legislature when considering annual appropriations for the over-all operation of the university. The elimination of such revenue

from consideration by the legislature would result in increased appropriations out of the general revenue of the state.

Moreover, as the more revenue-productive, existing facilities were amortized under the terms of outstanding agreements, the revenue therefrom would fall within the provisions of § 16-31-7. It follows that the proposed consolidation would presently result in the pledging of the state's credit for the obligations therein assumed.

    &ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;

It is clear therefore that even if the proposed new construction were eliminated from the proposed consolidated agreement the consolidation of the existing obligations for the purpose of equalizing rentals charged students would inevitably result in the incurring of a prohibited debt as the more revenue-productive facilities were amortized and the revenue therefrom became general."

The above Rhode Island case we believe used the same approach to the debt issue and constitutional interpretation that this court pursued in Boe v. Foss, supra. The decision in Boe v. Foss turned on the Constitution which has not changed.

I would grant the Writ of Prohibition as requested, and look to a constitutional revision, if the people desire it.