Ms. Cathyrn E. Hinshaw, Executive Director Arkansas Fire Police Pension Review Board P.O. Drawer 34164 Little Rock, Arkansas 72203
Dear Ms. Hinshaw:
This is in response to your request for an opinion on whether the Little Rock Police Pension Board may apply for and award a benefit increase to its "Deferred Retirement Option Plan" ("DROP") participants which would in effect result in a higher rate of interest being applied to amounts in the DROP account than is authorized by state law. You question whether it is appropriate to utilize the procedure in A.C.A. § 24-11-102 to award an increase in benefits, where to do so would result in an effective interest rate payment which exceeds that authorized at A.C.A. §24-11-434(e)(2)(A) (Supp. 1997).
Some explanation is necessary. It is my understanding that prior to the enactment of Act 492 of 1997, a dispute arose over the amount to be credited annually as interest to the credit of participants in the DROP account. The law at that time stated that: "A member who participates in this plan shall earn interest at a rate of two (2) percentage points below the rate of return of the investment portfolio of the policemen's pension and relief fund, but no less than the actuarial assumed interest rate as certified by the actuary." See former A.C.A. §24-11-434(e)(2)(A). A question arose under this former provision as to which "actuary" was responsible for certifying the appropriate rate — the local pension fund actuary or the actuary employed by the Arkansas Fire Police Pension Review Board. Apparently, the local actuary proposed to certify a significantly higher rate that the State Board's actuary. The law was clarified with the enactment of Act 492 of 1997 which amends the above provision to state that the rate shall be "as certified by the actuary under contract with the Arkansas Fire and Police Pension Review Board. . . ." The crediting of interest to the DROP account is now governed by this provision and is limited to two percentage points below the rate of return of the investment portfolio as certified by the State Board's actuary.
The Little Rock Police Pension Fund now proposes to adopt a "benefit increase" for only its DROP members under the provisions of A.C.A. §24-11-102. That provision allows a local pension board to increase benefits for future or current retired members and beneficiaries if certain conditions are met, including a finding that the proposed increase would be actuarially feasible. You suggest that this action is a mechanism to award the Little Rock participants a higher interest rate than is allowed by the statute above. You have asked whether this is legal, and also state a question as follows:
 Can the Board approve payment of an interest rate other than that specified in Act 492, or may the local fund pay such an interest rate pursuant to 24-11-434 to members of DROP either before the effective date of Act 492 and/or to those joining DROP after that date?
In response to your first question, as to whether the Little Rock fund may use a "benefit increase" under A.C.A. § 24-11-102 to award a higher interest rate than that allowed by law, it is my opinion that the answer to your question is "no." In my opinion, this is true because DROP participants may not be singled out for a benefit increase in this fashion. The law governing DROP provides that when a member elects to participate in DROP, "[t]he monthly retirement benefits that would have been payable had the member elected to cease employment and receive a service retirement shall be paid into the [DROP account]." A.C.A. §24-11-434(d)(3). Subsection (e)(1) of the same statute provides that: "The member's monthly retirement benefit shall not change, unless theplan receives a benefit increase." A.C.A. § 24-11-434(e)(1) (emphasis added). In my opinion the word "plan" as used in this subdivision refers to the local pension plan as a whole, and not to the participants in the Deferred Retirement Option "Plan." See, e.g., A.C.A. § 24-11-201(1) (defining the word "plan" to mean any Arkansas municipal policemen's or firemen's pension and relief fund). The intent of this provision, in my opinion, was that when a member elects to participate in DROP, his retirement benefits are frozen in time as of that moment. He is not to receive any increased benefits by virtue of salary increases he may receive in the interim, or reap the benefit of additional years of credited service. He may, however, receive the benefit of an across-the-board increase in benefits payable to pension plan participants generally. For purposes of his benefits being paid into the DROP account, he is to be treated as any other retiree. His would-be pension benefits are simply deposited in a special account and held in abeyance while he continues to work and draw salary. In my opinion the statute at issue (A.C.A. § 24-11-434(e)(1)), prevents a local police pension plan from adopting a benefits increase for only its DROP participants,[1] whether or not this action is deemed an unlawful payment of interest. The statute under which an increase of benefits is awarded, A.C.A. § 24-11-102, does not mention DROP participants,[2] and in my opinion the DROP legislation does not contemplate DROP participants as a segregable group to whom benefit increases may be awarded. This conclusion is further borne out by the local Little Rock Rules and Regulations. In the current Rules, it is stated that except for the additional benefits for service beyond twenty-five years, and disability benefits, "no further additional benefits shall accrue to the . . . participant during the time of participation in the DROP, unless any such increase is in accordance with Arkansas statutes." A former rule provided that a participant's monthly retirement benefit shall not change during participation in DROP, but if a "systemwide benefit increase" was adopted the participant's benefit might increase. Finally, the Little Rock Policemen's Pension and Relief Fund standard form for electing to participate in DROP states that: "Raises given to retirees are also given to DROP participants," indicating that across-the-board benefit increases given to all retirees apply to DROP participants. There is no indication that DROP participants are eligible for a group increase applying only to them.
The first part of your final question is whether the Board may "approve payment of an interest rate other than that specified in Act 492." The answer to this question, under state statutes, is obviously "no." Act 492 of 1997 controls the payment of interest to DROP accounts and uses mandatory language, (i.e. "a member who participates in [DROP] shall earn interest at a rate of. . . ." A.C.A. § 24-11-434(e)(2)(A) (emphasis added). The constitutional issue raised in your next question could have some bearing on this conclusion, however.
The second part of your final question is more difficult to answer. Although it is a little unclear, I interpret your question as having two parts: 1) whether the local board can, after the effective date of Act 492, credit the higher interest rate certified by its own actuary to persons who elected to participate in DROP prior to the effective date of Act 492; and 2) whether the local board can, after the effective date of Act 492, credit such a higher interest rate to those participants electing to participate in DROP after the effective date of Act 492.[3]
The second of these questions is easier to resolve, and in my opinion the answer is "no." Persons electing to participate in DROP after the effective date of Act 492 are charged with knowledge of the law governing the crediting of interest to their account and such provisions of law are incorporated by reference into the contracts they make. See, e.g.,Mahurin v. Oaklawn Jockey Club, 299 Ark. 13, 771 S.W.2d 19 (1989); Jonesv. Cheney, 253 Ark. 936, 936, 489 S.W.2d 785 (1973); citing Cross v.Graham, 224 Ark. 277, 272 S.W.2d 682 (1954).
The remaining portion of your question appears to raise a more difficult constitutional question. That is, must persons electing to participate in DROP at a time when, according to their understanding or interpretation of the law, the interest rate payable would be certified by a local actuary, and not a State Pension Board actuary, be credited with the higher interest rate certified by the local actuary? The question raises the possibility of the constitutional prohibition against the impairment of contracts, or the prohibition against disturbing "vested rights." The resolution of such a question would necessarily involve the "contracts" of particular pension fund members, and the local rules and regulations of a particular local pension fund. I cannot determine, in a bare legal opinion (i.e., absent all the facts), whether any constitutional imperative would compel the payment of the higher rate in a given instance. I will set out below, however, the applicable law on such matters.
The "impairment of contract" prohibition is set forth in article 2, § 17
of the Arkansas Constitution and in article 1, § 10 of the U.S. Constitution. The Arkansas Supreme Court has held that legislation which operates retroactively to impair existing contractual rights violates this constitutional principle. See Jones v. Cheney, 253 Ark. 926,489 S.W.2d 785 (1973); Pyle v. Webb, 253 Ark. 940, 489 S.W.2d 796 (1973). The Arkansas Supreme Court has also embraced the theory that a public employee, by accepting the terms and conditions of a law that provides for pensions to participating employees, enters into a contractual relationship with the public entity who passed the law. See Jones v.Cheney, 253 Ark. 926, 489 S.W.2d 785 (1973), citing Anders v. Nicholson,111 Fla. 849, 150 So. 639 (1933). In addition, it is generally held, without regard to these constitutional provisions concerning "contracts," that a state may not divest a person of "vested rights" through the enactment of subsequent legislation. This prohibition is applicable to the states by virtue of the Fourteenth Amendment to the United States Constitution. See generally 16A C.J.S. Constitutional Law § 229.
The constitutional question presented is whether, assuming there are "vested rights" or valid protectable contractual obligations in place, the enactment of Act 492 of 1997 impairs or divests these rights to any unconstitutional extent. Again, whether a particular participant has a "vested right" or a contractual right to a particular method of computing DROP interest may depend upon all the facts relating to his status in the plan and local rules and regulations. It is debatable, in my opinion, at least with regard to the circumstances you present, whether any such contractual or vested right exists in a particular method for the certification of an interest rate. The "Amended and Restated Rules and Regulations of the Little Rock Police Deferred Retirement Option Plan" do not address the question of who is to certify the rate (see id. at D. (11), although a former local rule did make reference to the local actuary, at least as regards the "actuarial assumed interest rate." See
former Little Rock Rules and Regulations § 18. The former legislation on the question was apparently unclear, prompting the legislature to "clarify" it. See Act 492 of 1997, (Title). In addition, it is generally held that there is no "vested right" in any particular mode of procedure, remedy or method of evaluation. See, e.g., Ellison v. Tubb,295 Ark. 312, 749 S.W.2d 650 (1988) and Public Serv. Comm. v. Lincoln-DeshaTelephone Co., Inc., 271 Ark. 346, 609 S.W.2d 20 (1980).
Even assuming such rights, however, an issue will arise as to whether an act which merely "clarifies" the law regarding which actuary will certify the proper interest rate actually "impairs" or divests any substantive rights. As noted by the Arkansas Supreme Court, "not every change that affects a contract constitutes an impairment." Beaumont v. Faubus,Governor, 239 Ark. 801, 805, 394 S.W.2d 478 (1965). Recent federal case law sets out the test to be applied as follows:
 The Constitution provides, `[n]o state shall . . . pass any law impairing the Obligation of Contracts. . . .' U.S. CONST. art. I, Section(s) 10, cl. 1. Read literally, this constitutional prohibition bans any interference with contracts, but cases interpreting the clause clearly indicate that this prohibition `is not an absolute one and is not to be read with literal exactness like a mathematical formula.' Home Bldg. Loan Ass'n v. Blaisdell, 290 U.S. 398, 428 (1934). Instead, when a litigant contends that a legislative amendment has impermissibly impaired contractual obligations, our inquiry initially focuses on `whether the change in state law has `operated as a substantial impairment of a contractual relationship.'' General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (quoting Allied Structural Steel Co. V. Spannaus, 438 U.S. 234, 244 (1978)) (other citation omitted). Three basic components are essential to this inquiry: (1) Does a contractual relationship exist, (2) does the change in the law impair that contractual relationship, and if so, (3) is the impairment substantial? Id. If we conclude that a substantial impairment of a contractual relationship exists, we must then carefully examine "the nature and purpose of the state legislation." Allied Structural Steel Co., 438 U.S. at 244.
Honeywell, Inc. v. Minn. Life Health Ins., 110 F.3d 547 (8th Cir. 1997). See also Beaumont, supra (discussing earlier federal case law).[4]
As can be seen from the language above, legislation is not unconstitutional under the contracts clause unless there is a contract and the impairment of the contract at issue is "substantial." A similar requirement applies under a "vested rights" analysis. See generally 16A C.J.S. Constitutional Law § 229, n. 53. Even then, a court will engage in an analysis of the legislation and whether the state had a "significant and legitimate public purpose behind the regulation." Burlington NorthernRy. Co. v. State of Nebraska, 802 F.2d 994 (8th Cir. 1986), quotingEnergy Reserves Group Inc. v. Kansas Power and Light Corp.,459 U.S. 400, 412 (1983).
This analysis would be undertaken by a court presented with all the facts and circumstances in order to determine whether, in a given instance, the payment of the higher interest is compelled. I cannot, in an official Attorney General's opinion, undertake the type of adversarial factual review necessary to definitively resolve the issue. It seems unlikely, however, based upon the facts with which I have been presented, that such a constitutional claim would prevail.
The foregoing opinion, which I hereby approve, was prepared by Deputy Attorney General Elana C. Wills.
Sincerely,
WINSTON BRYANT Attorney General
WB:ECW/cyh
[1] I thus conclude that the word "plan" as used in A.C.A. §24-11-434(e)(1) refers to the local pension plan and not the DROP plan. I am not unaware that elsewhere in A.C.A. § 24-11-434 the word "plan" is used to refer to the DROP plan. In my opinion, however, reading the statute as a whole with a view toward giving effect to the legislative intent, the word "plan" is not so used in A.C.A. § 24-11-434(e)(1).
[2] This statute was amended in 1995 to authorize an increase of benefits for "future or current retired members," but in my opinion, this language does not have reference to DROP participants as a segregable group.
[3] Your questions are with reference to actions to be taken after the effective date of Act 492, and I express no opinion on the actions of the state or local board taken in prior years under prior law with reference to the crediting of interest to DROP accounts.
[4] The language of the relevant Arkansas constitutional provision (art. 2, § 17) is identical to the language of the U.S. Constitution. The Arkansas Supreme Court, as in Beaumont, has expressed a willingness to look to federal case law on the issue.