**MORTON ARBORETUM, Plaintiff,**

**v.**

**James R. THOMPSON, et al.,
Defendants.**

**No. 84 C 6297.**

United States District Court,
N.D. Illinois, E.D.

Nov. 29, 1984.
On Motion for Reconsideration
Feb. 26, 1985.

Geoffrey G. Gilbert, Steven B. Varick, McBride, Baker & Coles, Lawrence J. Suffredin, Joseph A. Spitalli, Simon & Spitalli, Laurence A. Carton, Gardner, Carton & Douglas, Chicago, Ill., for plaintiff.

Donald J. Kreger, Russ M. Strobel, Stephen Fedo, Friedman & Koven, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Morton Arboretum ("Arboretum"), one of the major holders of Northern Illinois Toll Highway Revenue Bonds, Series of 1955 ("Bonds"), challenges the 1984 amendment (the "Amendment," P.A. 83–1258) to the statute (the "Act," Ill.Rev.Stat. ch. 121, ¶¶ 100–1 to 100–35) creating the Illinois State Toll Highway Authority ("Authority").[1] Arboretum says the new provisions of the Amendment impair the terms of the Bond resolution (the "Resolution") covering the original issuance of the Bonds, in violation of Arboretum's rights under (1) the Contract Clause (U.S. Const. art. I, § 10), (2) the Fourteenth Amendment[2] and (3) the Illinois Constitution's version of the Contract Clause (Ill. Const. art. I, § 16).[3]

---

1. Arboretum also originally advanced a claim under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq. ("NEPA") but has now acknowledged (Arb.Mem. 1–2) that claim has been rendered moot by action since taken by the United States Army Corps of Engineers. Arboretum's stated intention to file an "amended complaint" (Arb.Mem. 2) really contemplates a *supplemental* complaint (for it concerns facts occurring after the original complaint was filed, not additional facts in existence as of the original filing date, see Fed.R.Civ.P. 15(d)). Given this opinion's dismissal of Arboretum's original action in its entirety, any effort by Arboretum to return to court calls for a new lawsuit rather than a revival of this one.

2. Arboretum's Memorandum does not suggest any theory on which the Due Process Clause would be violated if the Contract Clause were not. Accordingly this opinion will, like the parties' own memoranda, deal only with the latter.

3. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 911, 919, 79 L.Ed.2d 67 (1984) appears to foreclose the last claim (though the result would be the same if it did not, for the Illinois constitutional provision is read in the same manner as the Contract Clause, *Hardin, Inc. v. Village of Mount Prospect,* 99 Ill.2d 96, 103, 75 Ill.Dec. 435, 438, 457 N.E.2d 429, 432 (1983)). *Pennhurst* certainly precludes this Court's dealing with the state law arguments advanced in Complaint ¶ 30.

For the reasons stated in this memorandum opinion and order, defendants' Fed.R.Civ.P. ("Rule") 12(b)(6) motion is granted and Arboretum's Complaint and this action are dismissed.

### Bondholders' Rights Under the Resolution

As the name "revenue bonds" indicates, holders of the Bonds cannot look to the faith and credit or taxing power of the State of Illinois (Res. § 7.01), but only to "Revenues" of the tollway system (the "Facility," as it is termed in the Resolution). In a fashion typical of revenue bond issues, the Resolution has a number of provisions designed to protect the integrity of the Bond payment provisions:

1. All revenues from tolls charged to users of the Facility and from other collateral income derived from the Facility (collectively "Revenues") are a trust fund "exclusively and irrevocably pledged ... for the security and payment or redemption of, and for the security and payment of interest on," the Bonds (Res. § 2.04).

2. Authority is obligated to set tolls at levels at least sufficient to service the Facility and to meet the current obligations (including minimum Sinking Fund requirements) on the Bonds (Res. § 4.01.-1).

3. No Revenues will be used for any purposes except those specified in the Resolution (Res. § 7.10).

4. No other bonds can be issued by Authority, nor can it create any other lien or charge on the Facilities or the Revenues (Res. § 7.04).

5. Minimum Sinking Fund requirements call for accelerating deposits typical of revenue bond issues, self-amortizing over the life of the Bonds (Res. § 4.03.2 (Third)). Excess Revenues must also be transferred to the Sinking Fund Account (Res. § 4.03.2(g)). All amounts in the Sinking Fund must be applied to payment and retirement or redemption of the Bonds (Res. § 5.04).

Authority has no *obligation* to create surpluses to accelerate retirement of the Bonds beyond the mandatory Sinking Fund requirements. Indeed Act ¶ 100–19 requires that tolls be fixed "at the lowest possible rate that will provide funds sufficient" to service the Facility and the Bonds, including Sinking Fund requirements (more of this later). Resolution § 4.01(4) specifically gives Authority the right to reduce tolls, conditioned only on (1) notice to interested parties, (2) current compliance with the funding requirements and (3) certification that the reduced rate will provide sufficient Revenues to meet the funding requirements for the next ten fiscal years.

### 1984 Amendment

To facilitate the construction, operation and maintenance of a new projected North-South Tollway, the 1984 Amendment provides for the issuance of Refunding Bonds for purposes of refunding the Bonds (Act ¶ 100–20.1). Under Act ¶ 100–20.1(f) all the Bonds will be "deemed paid and no longer ... outstanding for purposes of [the] [R]esolution ... and all rights and obligations under [the] [R]esolution ... shall be deemed discharged ..." upon establishment of an irrevocable trust with either:

(a) funds adequate to meet all payment obligations on the Bonds; or

(b) obligations issued or guaranteed by the United States government, the amount of which is sufficient to pay the Bonds; or

(c) the same kinds of obligations in an amount that, taking into account investment earnings on those obligations, will be sufficient to pay the Bonds.

Bondholders of course will retain "an irrevocable and unconditional right to payment in full of all principal of and premium, if any, and interest on such outstanding bonds, at maturity or upon prior redemption, from the amounts on deposit in such trust" (Act ¶ 100–20.1(f))—the difference being that they will look to the trust funds and not to the Revenues of the Facility.

*Rule 12(b)(6) Principles*

██ Last Term the Supreme Court announced the rule of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) was still alive and well and living in Washington. *Hishon v. King & Spalding*, —— U.S. ——, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984) phrased the applicable standard as requiring that a complaint survive unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." But as Judge Bua of this District Court has said in *Goodman v. Board of Trustees of Community College*, 498 F.Supp. 1329, 1337 (N.D.Ill.1980):

> Where, however, the plaintiff's cause of action arises out of a contract which has been attached to the complaint as an exhibit, and where such contract shows unambiguously on its face that the relief prayed for is not merited, dismissal is both justified and appropriate.

See *Jackson Sawmill Co. v. United States*, 580 F.2d 302, 311–12 (8th Cir.1978), affirming dismissal of a Contract Clause claim by revenue bondholders, based on the insufficiency of the complaint in light of the contract document. Here Arboretum's contract rights as an owner of Bonds are defined by the *Resolution*—the contract whose obligations are purportedly impaired by the Amendment. This Court rejects Arboretum's invitation (Mem. 5, 7, 8) to consider a constitutional inhibition on Authority to a greater extent than the Resolution provides, simply on the strength of the Official Statement issued when the Bonds were first sold (see n. 5).

*"Impairment" of the Obligations of the Resolution*

Arboretum urges the Amendment is an impermissible encroachment in Contract Clause terms because:

1. Revenues will no longer be collateral for the Bonds. Instead they will be available as collateral for the Refunding Bonds and the new Bonds to be issued to finance the North-South Tollway (Complaint ¶¶ 28(a) and (d)).

2. Surplus Revenues will be used for the North-South Tollway and not for early retirement or redemption of the Bonds (Complaint ¶¶ 28(b) and (e)).

3. There is no provision under the Amendment to raise additional funds if proceeds of the Refunding Bonds are inadequate to pay the Bonds at maturity (Complaint ¶ 28(c)).

4. Bondholders are deprived of the right to vote on amendments to the Resolution (Complaint ¶ 28(f)).

5. Refunding would jeopardize the Bonds' tax-exempt status (Complaint ¶ 28(g)).

Nothing in Arboretum's Memorandum suggests a basis for the last speculative argument, and Def.Mem. 18 (referring to issuance of an IRS private letter ruling to the contrary) shows it has no foundation. This opinion will therefore address only the other, more serious contentions.

██ Contract Clause cases disclose a nonliteral view of the "impairment" concept. Not every statutory alteration of contractual undertakings is a "law impairing [their] Obligation ..." in the constitutional sense. *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 705, 74 L.Ed.2d 569 (1983) provides a definitive overview of the operative principles:

> Although the legal issues and facts in these two cases [*United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) and *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)] differ in certain ways, they clarify the appropriate Contract Clause standard.

> The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co.*, 438 U.S., at 244 [98 S.Ct. at 2722]. See *United States Trust Co.*, 431 U.S., at 17 [97 S.Ct. at 1515]. The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. *Allied Structural Steel*

*Co.*, 438 U.S., at 245 [98 S.Ct. at 2722]. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. *United States Trust Co.*, 431 U.S., at 26–27 [97 S.Ct. at 1519–1520]. On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment.

■ True enough a stricter standard applies where the State seeks to alter *its own* contractual obligations. As *Energy Reserves, id.* at 412–13 n. 14, 103 S.Ct. at 705–06 n. 14 put it:

In *United States Trust Co.*, but not in *Allied Structural Steel Co.*, the State was one of the contracting parties. When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets. See *United States Trust Co.*, 431 U.S., at 25–28 [97 S.Ct. at 1519–1521]; *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 [55 S.Ct. 555, 79 L.Ed. 1298] (1935); *Murray v. Charleston*, [6 OTTO 432] 96 U.S. 432 [24 L.Ed. 760] (1878). But see *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 [62 S.Ct. 1129, 86 L.Ed. 1629] (1942). When the State is a party to the contract, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co.*, 431 U.S., at 26, 97 S.Ct. at 1519.

But the "threshold inquiry" remains whether there is any "substantial impairment"—whether Illinois is seeking to "walk away from its financial obligations." That threshold inquiry will be essayed first.

Arboretum and its fellow Bondholders have no vested stake in a particular remedy, for their fundamental right is to have both the interest and principal of their Bonds *paid* when due (in *Energy Reserves* terms, those are the State's "financial obligations"). As *Richmond Mortgage & Loan Corp. v. Wachovia Bank & Trust Co.*, 300 U.S. 124, 128–29, 57 S.Ct. 338, 339–40, 81 L.Ed. 552 (1937) said, albeit in the private obligor context:

The particular remedy existing at the date of the contract may be altogether abrogated if another equally effective for the enforcement of the obligation remains or is substituted for the one taken away.

Illinois' General Assembly has provided Bondholders with a remedy—funding of and payments from the irrevocable trust required by Act ¶ 100–20.1(f)—"equally effective" to the one afforded as a contractual matter by the original statute and the Resolution. Arboretum Mem. 5–6 speculates that Authority may not invest the Refunding Bond proceeds in United States or United-States-guaranteed securities, thus assertedly posing a fact question and precluding dismissal under Rule 12(b)(6). But that contention ignores both the statute's terms and the fundamental proposition that statutes must be construed to avoid constitutional problems. After all (as Arboretum ignores), Act ¶ 100–20.1(f) deals only with Authority's initial *deposit* into the irrevocable trust, for which purpose the statutory alternatives of depositing either funds or government securities make obvious sense.

How the trust fund is to be *invested,* and not its initial form, is the critical fact for Contract Clause purposes. Under the Act that is a matter for decision by the trustee, which must be a trust company or bank with capital and surplus of at least $100 million. Act ¶ 100–20.1(e) provides that pending the application of the Refunding Bonds' proceeds towards the purchase, retirement or redemption of the Bonds, such proceeds "may be invested" in United States or United-States-guaranteed securities. Because any arguable Contract Clause questions can be averted by giving Bondholders at least equal security to what they now have, this Court reads that provision (surely a permissible reading) as defining and limiting the authorized investment of the proceeds—as *requiring* investment

by the trustee in such securities (that is, if Authority does not itself exercise its right to deposit such securities in the first instance). Indeed the trustee's fiduciary obligations alone should require it to comply with that standard.

Accordingly Arboretum's effort at discovery of the "particulars of the planned refunding issue" (Arb.Mem. 7) is really beside the mark. If the refunding issue produces funds sufficient to provide security of full payment of the Bonds,[4] the "particulars" of the refunding are irrelevant.

Arboretum's only contention really worthy of consideration is that Bondholders now have the right to have Bonds retired or redeemed out of surplus Revenues, a right that will no longer exist with the funded irrevocable trust. On that issue too Arboretum complains of the lack of discovery—this time "information concerning the extent to which, in practice, surplus revenues have existed in the past, and have been used by the Authority to retire outstanding bonds by purchase or redemption" (Arb.Mem. 8).

But the flaw in Arboretum's position is in labeling what is nothing more than an expectancy as a *right*—as an "obligation" of the contract. It must be remembered Authority's contractual obligations, and the correlative rights of Bondholders, were defined by the Resolution itself when it was first adopted—not by what has since happened "in practice."[5]

Nothing in the Resolution obligates Authority, as a matter of contract law, to maintain tolls at a level that will provide ongoing accelerated Bond retirement. What controls in constitutional terms is that Authority has always had the unfettered contractual right to reduce tolls—and in fact it now has the statutory duty to keep them at the lowest level necessary for discharge of Authority's obligations, thus preventing a surplus buildup.[6]

Finally Arboretum mischaracterizes the Amendment as impairing "the right to have all of the outstanding bonds redeemed if the Authority chooses to divert the revenues of the existing facility to another purpose" (Arb.Mem. 12). Arboretum prefers to gloss over the obvious fact that Bondholders are creditors, *not* shareholders (who might perhaps be entitled to rely on a contractual undertaking for continued operations, as giving them an enforceable right to require the maintenance of such operations). Bondholders' basic right is to *payment,* and that right to payment of revenue bonds carries with it the assurance of operations simply because such operations are the only source of payment. However bondholders (unlike equity owners) have no contractual stake in operations as an end in themselves, as contrasted with operations as being merely the means to the end of payment. Thus Arboretum cannot be said to have an independent right to the method

---

**4.** Authority is of course right that the full faith and credit of the United States are superior to the existing pledge of Facility Revenues. For the reasons expressed in the text, it is unnecessary to decide the hypothetical question whether, if the trustee were to opt for some other form of investment, that too would provide security superior to the Bondholders' present contractual rights.

**5.** Arboretum also points to a reference in the Official Statement, issued when the Bonds were originally sold, to the possibilities of early retirement. Even though Arboretum has not tendered the Official Statement itself, both litigants' descriptions of that Statement reflect that any such discussion of future prospects was simply not *contractual* in nature (indeed, Arboretum's own Complaint consistently speaks only of the *Resolution* as the source of its contract rights,

now allegedly impaired by the Amendment). Though the Official Statement may have described what was anticipated, Bondholders had no contractual assurances other than the duty of the Authority to set tolls at a level that would "at least" service the minimum Bond payment requirements. In Contract Clause terms, the discussion of future possibilities (a full disclosure matter in the sale of securities) did not create an "obligation" whose impairment is prohibited by the Constitution.

**6.** When the Act was first passed, Authority's predecessor had that *right,* though not that *duty.* Ill.Rev.Stat. ch. 121, ¶ 314a40 (1953). It is absurd for Arboretum to suggest (Arb.Mem. 11) that the legislature's later enactment of a duty to that effect creates a potential impairment of contract. That enactment did not alter an *obligation*—it only reduced a possibility.

of Authority's operation, so long as the Amendment provides (as it does) at least equivalent security for payment.

All the foregoing discussion carries with it the rejection of Arboretum's related arguments, negating any notion of contract impairment in constitutional terms. Though Bondholders' rights have been somewhat altered, they have not been "substantially impaired." Most importantly, Bondholders' right to payment—the fundamental substantive right for which all the other procedural rights were conferred by the Resolution—has been assured. See *City of El Paso v. Simmons*, 379 U.S. 497, 514, 85 S.Ct. 577, 586, 13 L.Ed.2d 446 (1965); *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 514, 62 S.Ct. 1129, 1135, 86 L.Ed. 1629 (1942). Nor is *United States Trust* to the contrary, for the very factor the Supreme Court found lacking there—the need for replacement of the bondholders' security by "an arguably comparable security provision" (431 U.S. at 19, 97 S.Ct. at 1516)—*is* afforded by the Amendment.[7]

That really makes the second-level inquiry in *United States Trust* unnecessary—whether an "impairment," once established, violated the Contract Clause (see discussion 431 U.S. at 21–32, 97 S.Ct. at 1517–1523). It is nonetheless worth noting that during the course of that inquiry the Court said (*id.* at 25–26, 97 S.Ct. at 1519–1520):

> Of course, to say that the financial restrictions of the 1962 covenant were valid when adopted does not finally resolve this case. The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be

constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

In this case:

1. Illinois' General Assembly has determined the proposed North-South Tollway "is reasonable and necessary to serve an important public purpose" (431 U.S. at 25, 97 S.Ct. at 1519).

2. Any effective prohibition of such added tollways in the Resolution was not the substantive *purpose* of the Resolution, but was rather a protection to Bondholders against dilution of their security: the pledge of all Revenues from the original Facility.

3. By the Amendment's requiring establishment of an irrevocable trust with the proceeds of Refunding Bonds, the State has not "reduce[d] its financial obligations" (431 U.S. at 26, 97 S.Ct. at 1519) at all. Bondholders' contractual security is undiluted, and perhaps even enhanced.

Thus the Amendment satisfies the Contract Clause from both perspectives exemplified by *United States Trust*.

### Conclusion

Arboretum has therefore failed in its claim as a matter of law. And in light of

---

**7.** Though a state case is obviously not controlling authority as to the federal Constitution, *Beaumont v. Faubus*, 239 Ark. 801, 394 S.W.2d 478, 482 (1965) upheld a refunding provision wholly parallel to the one at issue here. *Beaumont's* analysis, which rebuffed challenges both under the Contract Clause and under the corresponding provision of the Arkansas Constitution, is persuasive and should be read in its entirety. Indeed the principal linchpins of the

dissent in *Beaumont* were the factors (both absent here) that (1) the State had pledged its full faith and credit for the original bonds, a promise repudiated by the refunding bond statute, and (2) the existing reserve fund for payment of the bonds was wiped out by the new legislation (while in this case, as the Resolution requires, excess Revenues have in fact been used to retire Bonds).

the analysis in this opinion, there is no prospect of restating its Contract Clause claim by amending the Complaint. Accordingly not only the present Complaint but this action itself must be and is dismissed (without prejudice, however, to Arboretum's possible assertion of a claim under NEPA if and when such a claim may ripen into existence).

## ON MOTION FOR RECONSIDERATION

Morton Arboretum ("Arboretum") has moved for reconsideration of this Court's November 29, 1984 memorandum opinion and order (the "Opinion") dismissing Arboretum's Contract Clause claim against the Illinois State Toll Highway Authority ("Authority").[1] For the reasons briefly stated in this memorandum opinion and order, the motion for reconsideration is denied.

Arboretum continues to insist that Bondholders' contractual right to the application of surplus revenues to early Bond retirement has been impaired in the Contract Clause sense. And of course what the Clause prohibits is "any ... Law impairing the Obligation of Contracts." Yet Arboretum's current Mem. 2 says (emphasis in original):

> The Arboretum has never contended that the Authority has an *"obligation* to create surpluses to accelerate retirement of the Bonds beyond the mandatory Sinking Fund requirements."

In an effort to escape that semantic dilemma, Arboretum argues (citing 3A Corbin, Contracts § 626, at 10 (1960) and *Donner v. New York City Employees' Retirement System,* 33 N.Y.2d 413, 353 N.Y.S.2d 428, 308 N.E.2d 896 (1974)) that "a benefit

may be conditional and still be constitutionally protected." *Donner, id.* at 416, 353 N.Y.S.2d 428, 308 N.E.2d at 898. But that begs the real question, which is whether the conditional benefit has real or only speculative value. If the latter, there is no meaningful "impairment" and hence no constitutional violation.

Where Arboretum leaves the rails is in arguing the test is one based on the actual performance of the Facility's operations in the many years that have passed since the Bonds were first issued. Not so. Instead the constitutional inquiry is as to the obligation of the *contract* (here the Resolution), and that means the obligation *when the contract was executed.*

It may be that for one or more of a number of reasons Authority has chosen to operate in a way that in fact generates a surplus. But that is very different from saying it is *obligated* to do so, or even that it has no practical choice except to do so. Thus, though it may be convenient to set tolls in amounts divisible by five,[2] there is no legal reason Authority must function in that manner. Its toll attendants could of course handle odd amounts, and its automatic toll machines are capable of accepting and counting pennies and being programmed for that purpose (if that is not already the case).[3]

In terms of its *purpose,* the provision in the Resolution creating Authority's duty to use available funds in excess of specified amounts to fund early retirements is obvious: It protects Bondholders against any diversion of Revenues and against Authority's pegging rates at an inordinately high level so as to generate surplus that might

---

1. This opinion will assume total familiarity with the Opinion. It continues the use of all defined terms in the Opinion.

2. Until the recent increase to a 40-cent level, passenger vehicles were charged 30 cents at each toll booth on the Facilities themselves, with lower tolls at certain exits.

3. Maybe there is a case for the investors' and Authority's justifiable joint expectations—at the time they contracted—having been for Facility operations that would have to produce surpluses

and therefore accelerated Bond retirements. If so, Contract Clause analysis would produce a result different from the one reached in the Opinion and here. But that is not the case Arboretum has presented in the Complaint or argued in its memoranda. This Court cannot simply speculate in those terms, despite the liberal criterion for judging complaints most recently stated in *Hishon v. King & Spalding,* —— U.S. ——, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984).

be used in any impermissible way. Again the mere presence of that contractual safeguard is not the equivalent of a reasonable inference—based on *factual* allegations—of the substantiality of the right it creates. Though the Opinion was based on the pleadings, under circumstances entitling Arboretum to reasonable factual inferences (see *Wolfolk v. Rivera,* 729 F.2d 1114, 1116 (7th Cir.1984)), Arboretum has again chosen to focus on Authority's post-contract operations rather than the expectations of the contracting parties when the Resolution was adopted.

It may be that Arboretum could craft a Complaint that could survive dismissal in the terms stated here (see n. 3). Instead Arboretum incorrectly characterizes this Court as having misunderstood Arboretum's claim. Arboretum would do better to examine the mote in its own eye. As stated at the outset of this opinion, its motion for reconsideration is denied.